**THOMPSON MEDICAL COMPANY, INC., Plaintiff,**

v.

**CIBA–GEIGY CORPORATION, Defendant.**

No. 85 Civ. 4928.

United States District Court, S.D. New York.

April 16, 1986.

Curtis, Mallet-Prevost, Colt & Mosle, New York City by Peter Fleming, Jr., Eliot Lauer, Katheyn S. Reimann, for plaintiff.

Patterson, Belknap, Webb & Tyler, New York City by Thomas Morrison, Andrew D. Schau, Lynn P. Freedman, for defendant.

LOWE, District Judge.

This is a case under the Lanham Act, 15 U.S.C. § 1125(a) and New York Law. The Court directed that plaintiff's motion for a preliminary injunction be combined with a full trial on the merits pursuant to Fed.R. Civ.P. 65(a)(2). A three day trial was held beginning on November 25, 1985. This opinion constitutes the Court's decision on the case, including findings of fact and conclusions of law.

## Background

The story of the instant dispute is a case study of what happens when an aggressive competitor enters a market dominated by a single supplier. Thompson Medical Co. Inc. ("Thompson") markets various over-the-counter (non-prescription) ("OTC") appetite suppressants under trade names which are generally some variation of the name "Dexatrim" (e.g. "Extra-Strength Dexatrim" and "Dexatrim-15"; collectively, all of Thompson's products will be referred to hereinafter as "Dexatrim").

The defendant, CIBA–GEIGY Corp. ("Ciba") is a relative newcomer to the OTC appetite suppressant market. Ciba makes a variety of products under the trade name "Acutrim". Both Acutrim and Dexatrim contain identical amounts of the same active ingredient—75 mg. of Phenylpropanolamine HCl ("PPA").[1] The difference between the products is the way in which they release the PPA over time.

PPA is permitted to be marketed as "safe and effective" as an OTC appetite suppressant by the Food and Drug Administration ("FDA"). The FDA allows daily dosages up to 75 mg. per/day in any of a variety of dosing regimens—e.g. 25 mg. three times a day; 75 mg. once a day, etc. Given this FDA approval, one would assume that there has been extensive well-controlled testing of the safety and effectiveness of PPA and its dosages. Surprisingly, this is not the case. The evidence presented at trial indicates that when the FDA was given control over OTC drugs, PPA was marketed in 75 mg. per day dosages. The FDA set-up a panel which made dosage recommendations, but the FDA chose not to follow the recommendations, instead it chose to "freeze the marketplace at the dosage limits that were available at that time. That was 75 miligrams maximum per day." (Halperin direct Tr. 123–24). Thus, all PPA products have a maximum daily dosage of 75 mg.

As noted, the only difference between Acutrim and Dexatrim is their respective time-release systems. Dexatrim used a conventional time-capsule release system. The time release system used in Acutrim, by comparison, is a rather sophisticated so-called "osmotic pump." In the Acutrim system, the PPA is surrounded by a semipermeable membrane which contains a small laser-drilled hole. As the shell absorbs fluid from the gastrointestinal tract, the PPA core dissolves and exits the shell through the hole. This "osmotic pump" delivers the PPA to the body at a far more consistent rate than the Dexatrim system. Studies of PPA bioavailability (the "BA")[2] indicate that the blood levels of PPA produced by Dexatrim tend to rise sharply after ingestion and then sharply drop-off, whereas the PPA levels induced by Acutrim are more constant and even.

Armed with these BA studies, Ciba engaged in an aggressive comparative adver-

---

1. PPA is a synthetic drug compound which has long been used as an ingredient in various cold medications. As an appetite suppressant, it causes a reduction in the user's appetite and thus assists the user in following a diet which will lead to a reduction in weight.

2. Bioavailability is the amount of active ingredient in a given volume of blood at a given time.

tising campaign which prominently utilized a graphic representation of the bioavailability data. In response, Dexatrim introduced a new product, Dexatrim 18, which was advertised as effective for 18 hours. Ciba brought an action to enjoin the advertising of Dexatrim–18, which was heard by Judge Broderick of this Court.[3]

Central to that case was the issue of the duration of appetite suppression. Because of the inherent difficulty in measuring hunger, there have been no well controlled *clinical* studies of duration.[4] Clinical studies, as opposed to BA studies, would require administering PPA to human subjects and then, somehow, measuring their hunger in a scientific way. Absent clinical duration studies, the question of whether Dexatrim–18 suppresses appetite for 18 hours was tried using BA studies. The inquiry then shifted to what blood level of PPA is necessary to suppress appetite.

Judge Broderick held that Thompson could not claim that Dexatrim–18 lasted 18 hours because the blood level (BA) of PPA dropped below 60 nanograms per M1/blood well before the 18 hour mark. Accordingly he indicated that he would enjoin the marketing of Dexatrim–18. The 60 nanogram level was chosen simply because if PPA is administered in three 25 mg. dosages per day, four hours apart, the BA of PPA is at 60 nanograms when the redosing occurs.[5]

Judge Broderick, in a subsequent decision, 85 Civ. 7070 (1985), characterized his holding as follows:

> My 60 nanogram per milliliter holding, to the extent that it was a holding in that prior opinion, may perhaps be characterized as a legal estoppel holding. It was applied to prohibit claims from being made that a product was effective when the blood level readings fell below 60 nanograms per milliliter. It did not, however, authorize the converse. It did not authorize a claim that a product was not effective if the blood levels fell below 60 nanograms per milliliter absent clinical proof to support such a claim.
>
> \*    \*    \*    \*    \*    \*
>
> Now, applying this in this case, that opinion in the former case prohibited Thompson from advertising that its products were effective when the blood level readings fell below 60 nanograms per milliliter, at least until such time as competent scientific or clinical proof established a precise minimum therapeutic level.
>
> That finding did not allow either Thompson or CIBA–GEIGY to claim that

---

**3.** No. 83 Civ. 8924 (S.D.N.Y.).

**4.** Judge Broderick noted:

> I think the next thing that I have to say is dictum. I have resisted an inclination to enjoin the continued marketing of either of these products until appropriate clinical tests have been conducted. We are in an area here where each one of the parties has a tremendous financial investment and there was testimony as to the millions that were involved in advertising.
>
> I recognize, from the testimony of various ... witnesses offered by both sides, how difficult it would be to prepare, to plan an appropriate clinical study in this area. And I also recognize the dangers involved in financing a clinical study which may turn out to be not very helpful but will always be available in the next lawsuit.
>
> At the same time, there is a public out there that is entitled to something more than attractive, entertaining and humorous advertisements. I say this is dictum because I have been persuaded by my law clerk that there are

limits on the power of a federal judge and that I cannot reach beyond the case in controversy.

Transcript of December 19, 1985 in 85 Civ. 7070 (VLB). Dictum or not, we are inclined to agree.

**5.** Judge Broderick held:

> The FDA has not yet found what an effective dose is or what the limitations are on an effective dose and its panel has not made such a finding. I certainly am not qualified to make such a finding. In due course, presumably that finding will be made after sufficient studies have been reviewed by the FDA, studies that will presumably relate effectiveness to intake into blood level and to bioavailability studies and bioequivalency studies.
>
> \*    \*    \*    \*    \*    \*
>
> All of the witnesses who testified that have expertise in this area made it clear that no one of them could fix a point at which PPA was effective because the necessary clinical studies related to pharmaceutical studies have not yet been done.

Transcript of January 30th 1984 at page 11.

a competitor's product was not effective when blood level readings fell below 60 nanograms per milliliter since such claims would not be supported by competent scientific proof.

Opinion dated December 19, 1985 pp. 8–9 (85 Civ. 7070).

In August 1985, Ciba began airing two television commercials which compared Acutrim to Dexatrim. They are referred to as the "Nightime" and "Sundae" commercials.[6] Thompson brought an action before this Court to enjoin those commercials. Thompson characterizes its complaint as stating five claims against Ciba's advertising of Acutrim. They are:

1. That a person who has taken a 12–hour appetite suppressant will binge and lose control when it wears off.

2. That Acutrim is at its strongest more than 12 hours after its ingestion.

3. That Acutrim has more active ingredients than any other appetite suppressant.

4. That Acutrim maintains a 60 nanogram level 4 hours longer than Extra-Strength Dexatrim.

5. That users of Acutrim lose more weight than users of Extra-Strength Dexatrim.

Ciba counter claimed against Thompson alleging that Thompson's advertising and packaging of Dexatrim is false.

Shortly after this action was filed, Ciba instituted a new action, *CIBA–GEIGY Corp. v. Thompson Medical Co., Inc.*, 85 Civ. 7070 (VLB), which Judge Broderick accepted as related to the previous litigation before him. In that case, Ciba challenged the durational claims made in regard to Thompson's new product Dexatrim–15. While at first the various claims and counterclaims in the two actions seemed distinct, as time passed it became increasingly clear that they were inextricably intertwined.

Judge Broderick completed trial on his case just prior to the beginning of trial in the instant action. At the start of trial in this case, counsel for both sides could not agree on which claims had been presented to Judge Broderick for decision. Because of heavy calendar congestion, this Court resolved to proceed with trial on any issues which the parties could not agree were presented to Judge Broderick and to reserve decision until Judge Broderick ruled. On December 19, 1985, Judge Broderick delivered his opinion in the case, and on January 2, 1986, he signed an order of

**6.** The "Nightime" commercial begins with the portrayal of a woman sitting alone on her couch at night. A voice tells us that her appetite suppressant has worn off and that she is all alone with her refrigerator. Her desire to eat is comically portrayed in the form of an enlarged, pulsating cheesecake that lies waiting for her in the refrigerator. The door to the refrigerator opens mysteriously, emiting an eerie glow. The actress then literally flies through the air towards the refrigerator. The sound effects grow in strength and intensity as she flys to the refrigerator. When she reaches the pulsating cheesecake her gaping mouth clamps down on it ravenously. The picture then cuts to the woman leaning against the closed refrigerator looking exhausted but satiated. Her 12 hour suppressant has failed her late at night. The scene then cuts to a bar graph which portrays Acutrim as a 16 hour product in comparison to 12 hour Dexatrim. A voice-over then states: "Next time try Acutrim. Acutrim lasts longer than any other appetite suppressant. A full 16 hours." This is followed by a picture of the Acutrim products and the tag line.

The "Sundae" commercial also takes place at night. It begins with two women seated at a counter. One sits in front of a behemoth-sized ice cream sundae. Her dieting companion, who looks rather glum, is eating half a grapefruit. The woman eating the sundae congratulates her companion for being so good on her diet. She then wonders aloud whether it hasn't been a lot longer than 12 hours since the time her companion took her 12–hour appetite suppressant. All the while, the dieter has been eying the sundae, trying to snatch a taste of it from a spoon which her friend has been absentmindedly passing in front of her face. The scene then cuts to a bar graph which portrays Acutrim as a 16–hour appetite suppressant in comparison to 12–hour Dexatrim. The voice-over states: "If your appetite suppressant calls it a day before you, you need Acutrim. Acutrim lasts longer than any other brand of appetite suppressant. A full 16 hours." Finally, the commercial cuts back to the dramatic scene in progress. The dieter, in a slapstick gesture, plunges headfirst into the ice cream sundae. This is followed by a picture of the products and the tag line.

injunction. Judge Broderick, *inter alia*, ruled that:

7. [CIBA] is enjoined from making any express or implied claims of therapeutic advantage or superiority over Extra-Strength DEXATRIM or other PPA appetite suppressants in any packaging, labeling, advertising, or promotional materials for ACUTRIM or ACUTRIM II, included but not limited to the following express and implied claims that were before this Court:

(a) that ACUTRIM or ACUTRIM II will aid in greater weight loss than Extra-Strength DEXATRIM or any other PPA appetite suppressant;

(b) that ACUTRIM or ACUTRIM II is more effective as an appetite suppressant than Extra-Strength DEXATRIM or any other PPA appetite suppressant;

(c) that ACUTRIM or ACUTRIM II has more active ingredients than Extra-Strength DEXATRIM or any other PPA appetite suppressant;

(d) that ACUTRIM or ACUTRIM II is stronger at night than Extra-Strength DEXATRIM or any other PPA appetite suppressant;

(e) that ACUTRIM or ACUTRIM II "works longest";

(f) that ACUTRIM or ACUTRIM II is the "Maximum duration appetite suppressant";

(g) that ACUTRIM or ACUTRIM II is the "longest lasting appetite suppressant";

(h) that ACUTRIM or ACUTRIM II "lasts longer than any other product";

(i) that ACUTRIM or ACUTRIM II provides "longer appetite suppressant delivery"; and

(j) that ACUTRIM or ACUTRIM II lasts longer than Extra-Strength DEXATRIM or any other PPA appetite suppressant;

unless and until plaintiff has at least one adequate and well-controlled comparative clinical study which demonstrates such therapeutic advantage or superiority.

8. Either party may make a claim of a specific duration for its own PPA appetite suppressants if such a claim is supported by one or more adequate and well-controlled bioavailability study. However, neither party shall make any express or implied claim in any packaging, labelling, advertising, or promotional materials: (a) that any PPA appetite suppressant is not effective or wears off when plasma concentrations of PPA HC1 fall below 60 nanograms per milliliter of blood, unless and until the minimum therapeutic level below which PPA is not effective as an appetite suppressant has been demonstrated through at least one adequate and well-controlled clinical study; (b) that any PPA appetite suppressant is effective when plasma concentrations of PPA HC1 are below 60 nanograms per milliliter of blood unless and until a minimum therapeutic level of less than 60 nanograms per milliliter of blood has been established for PPA as an appetite suppressant by at least one adequate and well-controlled clinical study.

9. [Ciba] is enjoined from depicting in any packaging, labeling, advertising, or promotional materials for ACUTRIM or ACUTRIM II the bar graph currently depicted on the ACUTRIM II package or any comparative duration bar graph unless and until the comparative duration depicted has been demonstrated by at least one adequate and well-controlled comparative clinical study.

\*     \*     \*     \*     \*     \*

11. In the event that either party markets any PPA appetite suppressant with a duration claim—including but not limited to a claim of a specific number of hours of duration—all packaging, advertising or promotional material containing such a claim shall explicitly state that said claim relates solely to blood levels. This provision applies to all currently marketed and future PPA products of plaintiff and defendant and their affiliates. The packaging changes required by this provision shall be effected upon

the next printing of the relevant packaging.

12. Neither party shall make any express or implied claim of therapeutic advantage or superiority over other PPA appetite suppressants unless and until such a claim is supported by appropriate clinical evidence.

### Discussion

#### (a) Thompson's Claims Against Ciba

[1] When one compares Thompson's claims against Ciba in the instant action with Judge Broderick's injunction it is apparent that most of the claims were resolved. Claim 2 was enjoined by Paragraph 7(a) (b) (c) and (d) of the Injunction,[7] claim 3 by Paragraph 7(c), claim 4 by Paragraph 7(b–i), and claim 5 by Paragraph 7(a) and (b).

The only claim that was not directly addressed by Judge Broderick was claim 1—that a person who has taken a 12–hour appetite suppressant will binge and lose control when it wears off. Although this claim was not before Judge Broderick, we find no grounds for issuing a further injunction against Ciba. Judge Broderick's injunction unquestionably spelled the death knell for the advertising plan used by Acutrim. Clearly the comparative durational claims were the heart of the challenged commercials and the offending portions cannot be redacted from the whole. Moreover, Ciba has indicated that it will not show the offending commercials again. Ciba's Post-Trial Memorandum at 2.[8]

Judge Broderick's injunction grants Thompson all of the relief to which it is entitled. Under the circumstances, there are no grounds for granting a second injunction against Ciba pursuant to either the Lanham Act or the New York General Business Law. Accordingly, we exercise our discretion and decline to issue any injunction against Ciba.

#### (b) Ciba's Counterclaims against Thompson

Thompson's advertising of Dexatrim differs in a significant way from Ciba's advertising of Acutrim. Thompson's advertising is not comparative.

Ciba sets forth two counterclaims against Thompson's advertising and packaging of various "put-ups" of Dexatrim (Extra-Strength Dexatrim (Defendant's Exhibit "N"), Extra-Strength Dexatrim Plus Vitamin C (Def. Ex. "BBBB"), etc.). One of the challenged statements appears on most Dexatrim packaging. It is simply the statement "LOSE WEIGHT FAST."

The second challenged statement is a variant of the claim that "studies show that compared to dieting alone, people who added Dexatrim to their diets lost 50% More Weight."

#### 1. The 50% More Claim

In August 1985, Thompson began airing a new television commercial (DX J) which is shown in the storyboard marked as DX K. The audio portion of the new ad makes the explicit claim that

"Studies showed that compared to dieting alone, people who added Dexatrim to their diets lost 50% more weight." [9]

Ciba argues that the 50% more claim is a literal "establishment claim"—that it represents that there is scientific evidence which establishes the truth of the statement. It goes on to argue that Thompson has insuf-

---

**7.** Even if this claim is not barred by the injunction, counsel for Ciba indicated, at trial, that Ciba would voluntarily remove the objectionable part of the commercial. (Tr. 322–25).

**8.** There is no need for us to decide whether it is true that one "binges" when PPA appetite suppressant wears-off because Ciba never argued that one did, in fact, binge. Rather, Ciba's defense was simply that the commercial was hyperbole. No purpose would be served by making a finding of fact whether the commercials did convey the message that one "binges" when Dexatrim wears off since those commercials will not be shown again.

**9.** During the commercial, a bar graph entitled "Weight Loss" depicts the 50% more claim. Superimposed on the screen in small print is the following disclaimer:

"Based on studies with Dexatrim's ingredient."

ficient reliable scientific evidence to support such a claim.

▮ The law of this Circuit is that establishment claims must be judged considering "all relevant circumstances," including:

1. the state of the testing art;

2. The existence and feasibility of superior procedures;

3. the objectivity and skill of the person conducting the test;

4. the accuracy of their reports; and

5. the results of other pertinent tests.

*Procter & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F.2d 114, 119 (2d Cir.1984).

However, the *Procter & Gamble* case also makes clear the burden of proving falsity is with the party challenging the commercial or packaging. As the Second Circuit stated, "each plaintiff bears the burden of showing that the challenged advertisement is false and misleading ..., not merely that it is unsubstantiated by acceptable tests of other proof." 747 F.2d at 119. Thus, the burden is on Ciba to show that the Dexatrim claim is false.

We agreed with Ciba that the television commercial makes a literal establishment claim when it tells viewers that "studies showed" that those who use the Dexatrim products in conjunction with their diet will lose 50% more weight than if they had dieted without Dexatrim.

Currently, marketed packages of EXTRA–STRENGTH DEXATRIM (DX L) feature a bar graph on the back panel. The bar graph bears the title "DIET WITH DEXATRIM AND LOSE 50% MORE WEIGHT." Below the bar graph the following statement appears:

Based on clinical studies with DEXATRIM's Ingredient Published in Leading Medical Journals (Available Upon Request).

The following additional explanation is printed beside the bar graph:

Clinical studies show that people who diet and use the appetite control ingredient in Dexatrim lose more weight—from 35% to 100% more weight than people who diet alone. Long lasting. Extra Strength Dexatrim is formulated to deliver a high therapeutic level of its appetite suppressant from mid-morning through bedtime, the time most people tend to overeat. Dexatrim's hard working, time released formula helps you eat less all day and lose more weight.

The exact correlation between the level of appetite control ingredient and the level of appetite suppression has not been established.

Despite the explanations or disclaimers surrounding the graph, the clear message of the package is that studies prove that if the consumer ingests the EXTRA–STRENGTH DEXATRIM capsules contained in the box in conjunction with diet, he will lose 50% more than if he simply diets.

At trial Thompson introduced various studies which it relies on to support its claim. See PX 83–96.[10] All of these stud-

10. Those studies are:

| PX NO. | Investigator | PPA DOSAGE |
|---|---|---|
| 83 | Altschuler | 50 mg. PPA and 200 mg. caffeine o.d. vs. mazindol |
| 84 | Altschuler | 25 mg. PPA drops with coffee or tea t.i.d. vs. placebo |
| 85 | Conte | 25 mg. Cube with coffee or tea t.i.d. vs. placebo with coffee |
| 86 | Conte | 50 mg. PPA b.i.d. vs. 50 mg. PPA and 200 mg. caffeine b.i.d. |
| 87 | Conte | 25 mg. PPA and 100 mg. caffeine and vitamins t.i.d. vs. diethylpropion |
| 88 | Conte | 75 mg. PPA and 200 mg. caffeine o.d. vs. diethylpropion |

| PX NO. | Investigator | PPA DOSAGE |
|---|---|---|
| 89 | Sebok | 50 mg. PPA and multivitamins b.i.d. vs. placebo |
| 90 | Sebok | 35 mg. PPA and 140 caffeine b.i.d. vs. placebo (with diet) |
| 91 | Sebok | 35 mg. PPA and 140 caffeine b.i.d. vs. placebo (without diet) |
| 92 | Griboff | 25 Mg. PPA and 100 mg. caffeine and multivitamins t.i.d. vs. placebo |
| 93 | Bradley (hypertensive patients) | Crossover: 25 mg. PPA t.i.d. for two weeks then 75 mg. PPA o.d. for two weeks vs. placebo |

ies contain fatal flaws. With the exception of exhibits 88, 93 and 96, each of the studies tested PPA in different dosages than Dexatrim.

Thompson argues that these studies are relevant because Dexatrim is "bioequivelant" to the products which were used in the studies. The concept of "bioequivelance" is simply that if two drugs can be shown to create the same BA of active ingredient, then the results of a test on one drug are applicable to the other. While we have no trouble accepting the merit of bioequivalance, we do not accept Thompson's argument that Dexatrim is bioequivelant to other dosages used in the studies. While PPA is certainly PPA regardless of its sources, the method of dosing has a yet unmeasurable effect on efficacy (Garvey—direct Tr. 377–78, see also Judge Broderick's Op. 26–27). We do not credit the argument that Dexatrim is bioequivelant to other dosing regimens of PPA. Thompson argues that one of Ciba's own studies—the so-called ALZA study (PX 9) concluded that Dexatrim is not different, in a statistically significant way, from PPA in an "aqueous solution". We do not credit this study in this regard, but rather we credit the testimony of Dr. Garvey who testified that the effectiveness of a PPA product depends upon the method of dosing. Tr. 377–78.

Based on the evidence before us, we do not believe that Thompson has established bioequivelancy of the non–75mg. dosages. In order to rely on non-Dexatrim studies, it is incumbent on Thompson to establish point-by-point bioequivalance with an established Dexatrim BA profile. Accordingly, we find that the offered studies which tested non–75 mg. dosages do not support Thompson's "50% more" claim.

Moreover, most of the studies used PPA in combination with caffeine. The FDA has banned the use of caffeine with PPA because it is generally considered to be dangerous. The evidence produced at trial clearly indicates that caffeine affects the efficacy of PPA. Accordingly, Thompson may not rely on any study which tested PPA in conjunction with caffeine.

Once these flawed studies have been removed, only two studies remain: PX 93 and PX 96. PX 93 is a study by Mathew Bradley, M.D. The study involved 12 patients, all of whom were hypertensive. Each patient was given 25 mg. PPA with 100 mg. caffeine three times a day for two weeks; the patient then received a Placebo twice a day for two weeks. Finally, the patient received 75 mg. PPA once a day for two weeks. During the period when the patients received the 75 mg. dosages they lost an average of 1.4 pounds per week, as compared to a loss of .63 pounds for the placebo period. This study provides very little support for Thompson. While a part of the study was based on a 75 mg. PPA product without caffeine, much of the study involved caffeine. In fact, only two weeks of 75 mg. PPA without caffeine was used. Accordingly, we do not credit PX93. It is not an accurate prediction of the efficacy of Dexatrim.

PX 96 is a computer rework of a study by Dr. Conte. The underlying study was marked as DX QQQ. We credit the testimony of Dr. Garvey in regard to this study. Dr. Garvey testified that, because of procedural problems, the study was invalid. (Garvey direct, Tr. 396). Moreover, one of Thompson's own internal memos attached to DX QQQ, on Thompson's stationery, stated:

> The study by Dr. Conte has been completed and 114 patients were entered. The data has been analyzed and does not show any significant differences between the 2 active drugs or between the 2 drugs and the placebo.
>
> This data is felt to be incomplete because the dropout rate was approximately 60% in each group over the 12 week period, which does not permit proper statistical

| PX NO. | Investigator | PPA DOSAGE |
|--------|--------------|------------|
| 94 | Bradley (hypertensive patients) | 25 mg. PPA t.i.d. vs. placebo |
| 95 | Conte | 12.5 mg. PPA t.i.d. vs. 25 mg. PPA t.i.d. vs. placebo |

| PX NO. | Investigator | PPA DOSAGE |
|--------|--------------|------------|
| 96 | Conte | 75 mg. PPA o.d. (12 hr.) vs. 75 mg. PPA o.d. (15 hr.) vs. placebo |

o.d. means "once-a-day"
b.i.d. means "twice-a-day"
t.i.d. means "three-times-a-day"

analysis. Therefore, this study is disqualified as incomplete.

Accordingly, DX QQQ and the computer rework of the study, (PX 96), does not support Thompson's "50% more" claim.

██ Therefore, we find that all of the studies relied on by Thompson are fatally flawed. This is especially true in light of the criteria established by the Second Circuit in *Procter & Gamble*. For example, there are clearly far superior procedures available to Thompson than using PPA in different dosing regimens with other ingredients (such as caffeine) and then attempting to prove bioequivalence to Dexatrim. Thompson could simply conduct a study actually using Dexatrim. In fact, it appears that DX QQQ was a study on Dexatrim and that it showed no "significant differences between the [Dexatrim] . . . and the Placebo."

Based on the evidence at trial, we find that Thompson has no credible studies which establish that people who use Dexatrim lose 50% more weight than people who simply diet alone. Moreover, Ciba has adduced sufficient evidenced to sustain its burden. Accordingly, the "50% more" claim is enjoined until sufficient studies have been produced to support the claim.

## 2. *The "Lose Weight Fast" claim*

Ciba's second counterclaim asserts that the statement "Lose Weight Fast" on various Dexatrim packages is false and misleading. Dexatrim packages all have a "fifth panel" or "riser card" extending vertically above the actual box (Tr. 333). Prominently displayed on the fifth panel of all the Dexatrim boxes is the phrase "Lose Weight Fast" followed by an asterisk.

The asterisk refers the consumer to a "disclaimer" footnote printed in small letters on the top edge of the box. Several different Dexatrim packages, with several different disclaimers, are currently available on store shelves. The disclaimers on these boxes include the following:

People in controlled clinical studies have lost an average of 1.2 lbs. per week. In addition, thousands of consumers have reported to us that they lost up to 5 lbs. the first week, up to 25 lbs. in 12 weeks, using the appetite control ingredient in DEXATRIM. (DX M)

\* \* \* \* \* \*

The amount and speed of weight loss varies with the individual. People in controlled studies have lost an average of 1.2 lbs. per week. In addition, thousands of consumers have reported to us [\*] that they lost an average of 5 lbs. the first week, 25 lbs. in 12 weeks using the appetite control ingredient in DEXATRIM.

---

\* Average weight loss of over 10,000 consumers returning package insert cards. (DX L)

Ciba contends that the "Lose Weight Fast" claim is also an establishment claim. Specifically, it asserts that consumers will understand the statement as indicating that scientific evidence demonstrates that users of Dexatrim will: (1) lose weight fast; and (2) lose an average of 1.2 pounds per week. They also assert that a significant percentage of consumers will (3) interpret the phrase to promise an amount and speed of weight loss greater than 1.2 lbs. Ciba argues that there are no scientifically acceptable tests which establish the truth of these claims and that they are in fact false.

The alleged establishment claim that users will "Lose Weight Fast" is very different from the far more specific claim that a user will lose 1.2 lbs. per week or more.

"Fast" is merely a general term. It is defined as "[a]ccomplished in a relatively little time." American Heritage Dictionary, U.S. Government Second College Edition (Houghton Mifflin Co. (Boston)). The FDA Proposed Monograph on the use of PPA concludes "that some labelling claims are either vague, misleading or unsupported by scientific data." PX 56. The Monograph would specifically ban some claims such as:

Contains one of the most powerful diet aids available without prescription.

Now enjoy a slim, trim figure. Lose pounds. Reduce inches.

Lose weight starting today, * * * Look your best, feel your best.

*Id.*

■ Ciba argues that "lose weight fast" is similar to these claims and therefore should be banned. We disagree. The average consumer of reasonable intelligence would not read the phrase "Lose Weight Fast" as a specific establishment claim. Consumers would impute the normal dictionary definition of "relative" quickness. Thompson specifically explains that the "amount and speed of weight loss varies with the individual."

Ciba points out that its consumer study of the packaging (DX M) found that in response to the question "How many pounds per week would you consider the phrase 'Lose Weight Fast' to mean?," 95% of the respondents gave answers in excess of 1.2 lbs/per week. However, the question was asked only after the respondent had had a long period of time to examine the Dexatrim package carefully—including the footnote which mentioned consumer reports of five pounds in one week. Their response was obviously tainted by the information in the footnote. Accordingly, we do not credit DX M in this regard. With proper explanatory disclaimers, we do not believe that the phrase "Lose Weight Fast" is false and misleading. Rather, we believe that consumers would understand the phrase to be mere "puffery."

This is not to say that the statement taken as a whole is not misleading. To the contrary, DX M clearly indicates that the overall effect of the statement in conjunction with the footnote is to convey the message of greater weight loss than can actually be expected. In making this finding we stress that we do not believe the phrase "Lose Weight Fast" is misleading; rather, part of the footnote disclaimer is misleading.

■ The first part of the footnote that Ciba challenges is the claim that "[p]eople in controlled clinical studies have lost an average of 1.2 lbs. per week." In support of this statement, Thompson relies on the same studies discussed *supra* under the "50% more" claim. Ciba attacks the studies on the same ground. As we previously discussed, these studies show some general efficacy of PPA, but may not be relied on to establish specific weight loss efficacy. For the same reasons stated previously, Thompson may not rely on these studies. Accordingly, the claim of average weight loss of 1.2 lbs./week will be enjoined until an appropriate clinical study is conducted.

The second challenged part of the footnote is the claim that "thousands of consumers have reported to us that they lost up to 5 lbs. the first week and up to 25 lbs. in 12 weeks ..." This data was developed from cards which were placed in Dexatrim packages. Dexatrim users were asked to fill out the card and return it by mail. Thompson does not, in any way, claim that this is a scientific sample or that consumers can, in fact, expect to lose 5 lbs. per week.[11]

■ Sixty-seven percent of the people interviewed in DX M believed that users could expect to lose 5 lbs. per week or more. While the statement that "consumers have reported" such loss may be literally true, the clear innuendo, as demonstrated by DX M, is that consumers believe they will lose 5 lbs. or more. This claim is unquestionably false and misleading. Accordingly, the use of the data from the consumer cards will also be enjoined.

In sum, we enjoin the use of specific weight loss claims until appropriate clinical evidence is developed to establish such claims. We do not enjoin the use of the statement "Lose Weight Fast" so long as it is coupled with an appropriate disclaimer, *i.e.* one which points out that the amount and speed of weight loss depends on the individual and the individual's diet and that no specific weight loss is claimed.

**11.** Beyond the obvious problem with any non-random survey, the "response cards" are likely tainted by the inherent unreliability of self weight reporting.

## CONCLUSION

After full trial on the merits, the plaintiff's claims for relief are denied; the defendant's counterclaims are granted in part and denied in part; the defendant is to submit a final judgment of permanent injunction in accordance with this opinion; and the case is closed.

It Is So Ordered.