**SUMMIT TECHNOLOGY, INC., Plaintiff,**

v.

**HIGH–LINE MEDICAL INSTRUMENTS, CO., et al., Defendants.**

**No. CV 95–6491 ABC (SHx).**

United States District Court,
C.D. California.

July 16, 1996.

Blanc Williams Johnston & Kronstadt, John A. Kronstadt, John C. Rawls, Cynthia S. Arato, Mona D. Miller, Los Angeles, CA, for plaintiff.

Foley Lardner Weissburg & Aronson, James R. Kalyvas, Shana T. Torem, Los Angeles, CA, for Hi–Line Medical.

Blecher & Collins Maxwell Blecher, Alicia Rosenberg, William C. Hsu, Los Angeles, CA, for Kenneth York/York Lago Eye Center.

Alioto & Alioto, John Alioto, Margaret M. Weems, San Francisco, CA, for William Ellis/Eye Center of No. Calif.

## ORDER RE: DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT .

COLLINS, District Judge.

Defendants' motions to dismiss Plaintiff's First Amended Complaint came on regularly for hearing before this Court on July 15, 1996. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that Defendants' motions are GRANTED in part and DENIED in part.

### I. Procedural Background

On September 28, 1995, Plaintiff SUMMIT TECHNOLOGY, INC. ("Summit") filed a Complaint against Defendants HIGH–LINE MEDICAL INSTRUMENTS COMPANY, INC., d/b/a HI–LINE MEDICAL ("Hi–Line"), KENNETH K. YORK AND YORK LASER EYE CENTER ("York" Defendants), WILLIAM ELLIS AND EYE CENTER OF NORTHERN CALIFORNIA, INC. ("Ellis" Defendants), and PARIS E.

ROYO, PARIS E. ROYO, INC. and ROYO EYE CENTER MEDICAL GROUP ("Royo" Defendants). Summit asserts that Defendants have unlawfully imported, advertised, promoted, used, or serviced Summit Excimer Laser Systems (used to correct a variety of vision disorders) which, according to Summit, have not been approved by the United States Food and Drug Administration ("FDA"). The original Complaint asserted causes of action for false and misleading advertising under § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), importation of goods bearing infringing marks or names (15 U.S.C. § 1124), infringement of a registered trademark (15 U.S.C. § 1114), copyright infringement, unfair competition in violation of Cal.Bus. & Prof.Code § 17200, common law unfair competition, false and misleading statements in violation of Cal.Bus. & Prof. Code § 17500, and violation of the Sherman Food, Drug, and Cosmetic Act (Cal. Health & Safety Code §§ 26000–26851).

On February 28, 1996, the Court dismissed Summit's original Complaint in its entirety. *See* Order (dated February 28, 1996); *Summit Technology, Inc. v. High–Line Medical Instruments Company, Inc.*, 922 F.Supp. 299 (C.D.Cal.1996). For the most part, this dismissal was with prejudice and without leave to amend. However, the Court dismissed Plaintiff's false and misleading advertising claims (Lanham Act § 43(a) and Cal.Bus. & Prof.Code § 17500) and its California unfair competition claims without prejudice and with leave to amend.

On April 5, 1996, Plaintiff filed a First Amended and Supplemental Complaint ("FASC") against Defendants Hi–Line, York and Ellis.[1] In the FASC, Plaintiff asserts causes of action for violations of 15 U.S.C. § 1125(a), unfair competition in violation of Cal.Bus. & Prof.Code §§ 17200 *et seq.*, common law unfair competition, and violations of Cal.Bus. & Prof.Code §§ 17500 *et seq.* The substance of these allegations will be discussed in further detail below. In addition, Plaintiff initially asserted causes of action against York and Ellis for violation of 15 U.S.C. § 1124 and copyright infringement.

On April 24, 1996, the parties stipulated to dismiss these last two claims against York and Ellis because they would be directly subject to the Court's February 28, 1996 Order.

On May 15, 1996, Defendants filed separate motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). On June 17, 1996, Plaintiff filed a consolidated Opposition to Defendants' motions. Defendants filed separate Reply briefs on July 1, 1996.

## II. Plaintiff's Allegations

In the FASC, Plaintiff realleges the underlying facts alleged in the original Complaint. In its prior Order, the Court discussed these allegations in great detail. *See Summit*, 922 F.Supp. at 302–04. Accordingly, there is no reason to repeat that discussion in large part. Nevertheless, some repetition will be required in order to fully describe the First Amended and Supplemental Complaint.

As discussed in the prior Order, Summit is a Massachusetts corporation that develops, manufactures, sells, and services ophthalmological laser systems for treatment of a variety of eye disorders. FASC ¶¶ 10, 16–18. It holds a registered trademark in the name "Summit Technology." FASC ¶ 21. In the past decade, Summit has manufactured and sold its "Excimer" laser systems for use abroad and in the United States. FASC ¶ 31. Some of these products were manufactured at domestic Summit facilities and some were manufactured at a Summit facility in Ireland. FASC ¶ 35.

On March 10, 1995 and October 20, 1995, Summit received FDA approval for the commercial use of two Excimer systems, the ExciMed UV 200LA (domestic) and SVS Apex (domestic) Systems, to perform Phototherapeutic Keratectomy ("PTK") and Photorefractive Keratectomy ("PRK") under limited circumstances. FASC ¶¶ 32–33. Prior to FDA approval, Summit marketed its Excimer systems in approximately 45 foreign countries, including Canada, Mexico, and several European countries. FASC ¶ 35. Two of the models sold abroad are the ExciMed UV 200LA (international) and the SVS Apex

---

**1.** Also on April 5, 1996, Plaintiff and the Royo Defendants notified the Court that they had set-

tled and stipulated to the dismissal of the Royo Defendants with prejudice.

(international) systems. FASC ¶ 36. According to Plaintiff, these systems differ materially from their domestic counterparts. FASC ¶ 36.

The core allegation in Plaintiff's First Amended and Supplemental Complaint is that Defendants have acquired, sold, or used international models of the Excimer systems in the United States. More specifically, Plaintiff alleges that Defendant Hi–Line has "acquired, imported, reimported or facilitated the importation or reimportation into the United States for distribution in the United States" used Summit Excimer systems. FASC ¶ 48. Summit also alleges that Hi–Line may have acted as a broker, arranging or facilitating the sale of the used international Summit systems. FASC ¶ 48. According to the FASC, Hi–Line has also advertised and promoted the availability of Summit Excimer systems in sales catalogs, brochures, and at conventions orally. FASC ¶ 49.

In these advertisements, Hi–Line has allegedly made numerous false or misleading statements about the Summit systems. FASC ¶ 50. The specifics of the statements will be discussed in further detail below. According to Plaintiff, the statements allegedly convey the false impression that Summit is affiliated with or approves of Hi–Line's actions, and that there is no difference between the international Excimer laser system models and the domestic models. FASC ¶ 50. Furthermore, Plaintiff alleges that Hi–Line's statements convey the impression that the used Hi–Line models can be maintained, installed, serviced and tested by Hi–Line in a manner that makes the machines safe and reliable. FASC ¶ 50. According to Summit, Hi–Line's allegedly false or misleading statements are likely to cause public confusion and threaten to harm Summit in a variety of ways. FASC ¶ 55–56.

Plaintiff alleges that Defendant Ellis purchased a Summit ExciMed UV 200LA (international) in Canada in August 1994 and then imported it into the United States. FASC ¶ 58. The laser machine purchased by Ellis bears a label stating: "*CAUTION* [—] Investigational Device; Limited by Federal Law to Investigational Use." FASC ¶ 58. Simi-

lar restrictions also appear in the manual accompanying the machine. FASC ¶ 58. According to Plaintiff, prior to purchasing the laser, Ellis sought and received an opinion from counsel, stating that Ellis could lawfully import the device only if it were "solely for use and experimentation upon animals." FASC ¶ 59. And, in order to pass the machine through U.S. Customs, counsel advised Ellis that the machine had to be "clearly labelled" to exclude the possibility that the machine would be used upon humans. FASC ¶ 59. Ellis allegedly followed this advice and directed his customs broker to indicate that the laser system was for "non-human use." FASC ¶ 60. After the successful importation, Ellis also allegedly told an FDA representative (who was visiting Ellis' office) that the "Excimer laser will be used for animal research … only." FASC ¶ 61.

According to Plaintiff, Ellis, in fact, "fully intended" to use the imported device on humans. FASC ¶ 62. Moreover, according to Plaintiff, Ellis has never conducted a single animal study with the laser system. FASC ¶ 62. However, Ellis allegedly has performed, continues to perform, and offers to perform various surgical procedures (including PRK and Laser Intrastromal Keratomileusis ("LASIK")) with his imported Summit Excimer laser, although the FDA allegedly has not approved the use of his system for these procedures. FASC ¶ 63. In addition, Ellis has allegedly made a variety of false and misleading statements, by means of writings, advertisements, radio, television, and video. FASC ¶ 64. The specific details of the statements will be discussed below. According to Plaintiff, these statements imply: (1) that the ExciMed UV 200LA (international) possessed by Ellis is the same as the Summit device sold domestically by Summit; (2) that the Ellis system has been properly serviced and tested; (3) that the Ellis system has been approved by the FDA; (4) that the Ellis system is a new laser. FASC ¶ 64. Ellis' allegedly false or misleading statements are likely to cause confusion in the public, and threaten to harm Summit in a variety of ways. FASC ¶ 82–83.

According to Plaintiff, Defendant York has acquired two used Summit Excimer systems. FASC ¶ 84. York allegedly acquired one of the machines, a Summit Excimed UV 200LA, from Defendant Hi–Line. According to Plaintiff, this machine was originally sold to a person outside the United States under an agreement that barred any sale or shipment into the United States. FASC ¶ 85. In addition, according to Plaintiff, when sold by Summit, the machine had a label stating: "Investigational Device in Canada. To be used by qualified investigators only." FASC ¶ 85. York was allegedly aware that the machine was for Canadian investigational use when he purchased the used machine. FASC ¶ 86. York's other laser is allegedly either also an ExciMed UV 200LA (international) or a Summit SVS Apex (international), manufactured outside the United States and sold pursuant to similar restrictions detailed above. FASC ¶ 86.

In April 1995, York allegedly began commercial use of the Excimed UV 200LA (international) laser on humans. FASC ¶ 87. Using this imported used machine, York has allegedly performed and continues to perform various surgical procedures, including PTK, PRK, and LASIK, despite the alleged lack of FDA approval. FASC ¶ 88. York allegedly knew that neither machine had received FDA approval at the time he purchased the machines. FASC ¶ 89. On January 27, 1995 and February 24, 1995 York signed documents stating that he was aware that the FDA had not approved the Summit laser machines for PTK and PRK, and that he has not and will not use the machines on humans, except in full compliance with the United States Food, Drug, & Cosmetic Act ("FDCA"). FASC ¶¶ 90–91 and Exhibits 31 and 32 (attached to the FASC). However, in a letter to Hi–Line dated April 6, 1995, York allegedly complained that the ExciMed UV 200LA (international) was non-operational because of lack of parts and servicing, and because of this, York was losing business on PTK and PRK surgery. FASC ¶ 93 and Exhibit 33 (attached to the FASC).

According to Plaintiff, York has allegedly attempted to avoid FDA prohibition on York's use of the reimported Summit system by modifying the laser and claiming the machine is a "custom" device. FASC ¶ 95. Further, York has allegedly promoted and advertised his used Summit machines by making false or misleading oral and written statements. FASC ¶ 96. The specific details of these statements will be discussed below. Plaintiff alleges that these statements convey the impression that York has a "custom" laser (as opposed to used Summit lasers) that is safe, properly installed and maintained, and has been approved by the FDA. FASC ¶ 96. The allegedly false or misleading statements are likely to confuse the public and harm Summit in a variety of ways. FASC ¶¶ 101–02.

The FDA has sent warning letters to each of the Defendants. On April 28, 1995, the FDA sent a warning letter to Hi–Line, stating that foreign model Summit Excimer Laser Systems could not be sold or imported into the United States. FASC ¶ 41 and Exhibit 7 (attached to the FASC). On May 22, 1995, Hi–Line responded to the FDA letter, essentially denying that Hi–Line's conduct had violated the FDCA or FDA regulations, and stating that the Hi–Line models were the same as those Summit models approved by the FDA. See Exhibit 8 (attached to the FASC). On August 1, 1995, the FDA responded to the May 22, 1996 letter and adhered to its position. FASC ¶ 42 and Exhibit 9 (attached to the FASC). On November 8, 1995, the FDA further stated that Hi–Line was violating the law and the Hi–Line machines were subject to seizure. FASC ¶ 42 and Exhibit 10 (attached to the FASC).

On August 11, 1995, the FDA sent a similar warning letter to Ellis. FASC ¶ 43 and Exhibit 11 (attached to the FASC). The FDA confirmed its position on November 8, 1995, warning Ellis that his machine was subject to seizure. FASC ¶ 44 and Exhibit 10 (attached to the FASC). On April 26, 1995, the FDA sent a similar warning letter to Defendant York, warning York that his machines were not approved by the FDA and were "adulterated and misbranded," and did not meet the definition of a "custom" device. FASC ¶ 45 and Exhibit 13 (attached to the FASC). The FDA confirmed this position on August 1, 1995 and November 8, 1995.

FASC ¶ 46 and Exhibits 15 and 16 (attached to the FASC). On February 23, 1996, the U.S. Customs Service issued an "Import Alert," stating that Hi–Line had been importing Summit machines intended for export and not for the U.S. market. FASC ¶ 47 and Exhibit 17 (attached to the FASC). The "Import Alert" also states that Summit machines sold abroad but not intended for domestic use should be detained at the border without physical examination. *Id.*

In sum, Plaintiff alleges that Defendants have made false and misleading statements intended to deceive the public as to the origin and affiliation of the reimported Summit machines. In addition, Plaintiff alleges that Defendants' statements misrepresent the nature, characteristics, or qualities of their goods, services or commercial activities, in violation of 15 U.S.C. § 1125(a). Further, Plaintiff alleges that Defendants have engaged in unfair competition, in violation of Cal.Bus. & Prof.Code §§ 17200 *et seq.* and the common law.[2] Finally, Plaintiff asserts that Defendants have engaged in false or misleading. advertising, in violation of Cal. Bus. & Prof.Code §§ 17500 *et seq.* Plaintiff seeks injunctive relief, damages, attorneys' fees, recovery of profits, and costs.

## III. Discussion

### A. Standard for Motion to Dismiss for Failure to State a Claim

■ A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure.* § 1356 (1990). A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theo-

ry." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988).

■ A court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986); *see also Russell v. Landrieu,* 621 F.2d 1037, 1039 (9th Cir. 1980) (finding that the complaint must be read in the light most favorable to the plaintiff). However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 973 (8th Cir.1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969).

■ Furthermore, unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1483 (9th Cir.1991), *overruled on other grounds by Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., et al.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). A court may, however, consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989); *Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279 (9th Cir.1986), *abrogated on other grounds by Astoria Federal Savings and Loan Ass'n v. Solimino,* 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).

■ Lastly, a Rule 12(b)(6) motion "will not be granted merely because [a] plaintiff requests a remedy to which he or she is not

---

2. In support of its California unfair competition allegations, Summit asserts that Defendants have violated the California Sherman Food, Drug, and Cosmetic Act (Cal.Health & Safety Code §§ 26000–26851), Cal.Bus. & Prof.Code § 2234, and the Lanham Act. FASC ¶ 109. In addition, Plaintiff asserts that Defendants have knowingly obtained lasers from parties, "who by contractual restrictions and otherwise, were not permitted to sell them for commercial use or for shipment to the United States." FASC ¶ 109. Finally, Summit contends that Defendants have defrauded consumers by making false and misleading statements about their Excimer machines.

entitled." Schwarzer, et al., *Civil Procedure Before Trial* § 9:230. "It need not appear that plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted." *Doe v. United States Dept. of Justice.*, 753 F.2d 1092, 1104 (D.C.Cir.1985); *see also Doss v. South Central Bell Telephone Co.*, 834 F.2d 421, 425 (5th Cir.1987) (demand for improper remedy not fatal if claim shows plaintiff entitled to different form of relief).

## B. Analysis

As stated above, on February 28, 1996, the Court dismissed Plaintiff's original Complaint in its entirety. In its First Amended and Supplemental Complaint, Plaintiff focuses its case on Defendants' allegedly false and misleading statements, as well as Defendants' allegedly unfair competition. Because each Defendant made separate statements, engaged in separate conduct, and each Defendant has filed a separate motion, the Court will address Plaintiff's allegations against each Defendant separately within the context of each cause of action.

### 1. Plaintiff's First Claim for Relief Under § 43(a) of the Lanham Act

In relevant part, § 43(a) of the Lanham Act states as follows:

Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 11 U.S.C. § 1125(a). As indicated by the statute, there are essentially two general categories of § 43(a) violations—trademark infringement/false designation of origin (15 U.S.C. § 1125(a)(1)(A) and false advertising (§ 1125(a)(1)(B))). Summit asserts both theories against all three Defendants.

 In order to succeed on an infringement/false designation of origin claim under § 1125(a)(1)(A), Plaintiff must prove each of the following elements:

(1) defendant uses a designation (any word, term, name, device, or any combination thereof) or false designation of origin;

(2) the use was in interstate commerce;

(3) the use was in connection with goods or services;

(4) the designation or false designation is likely to cause confusion, mistake, or deception as to (a) the affiliation, connection, or association of defendant with another person, or (b) as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another person; and

(5) plaintiff has been or is likely to be damaged by these acts.

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27.03[1][a]. "A likelihood of confusion exists when consumers 'are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques.'" *Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir.1993) (quoting *Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 604 (9th Cir.1987) and *Shakey's Inc. v. Covalt*, 704 F.2d 426, 431 (9th Cir.1983)). Further, the Ninth Circuit has identified six basic factors critical to a court's inquiry into likelihood of confusion: (1) the strength of the plaintiff's mark; (2) the similarity of the marks; (3) evidence of actual confusion; (4) marketing channels used; (5) type of goods and degree of care likely to be exercised by the purchaser of the goods; and (6) defendant's intent in

selecting the mark. *Americana Trading, Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir.1992).[3]

In order to make out a false advertising claim under § 1125(a)(1)(B), Plaintiff must prove the following five basic elements:

(1) in its ... advertisements, defendant made false statements of fact about its product or the product of another;

(2) those advertisements actually deceived or have the tendency to deceive a substantial segment of their audience;

(3) the deception is material, in that it is likely to influence the purchasing decision;

(4) defendant caused its falsely advertised goods to enter interstate commerce; and

(5) plaintiff has been or is likely to be injured as the result of the foregoing either by direct diversion of sales from itself to defendant, or by lessening of the good will which its products enjoy with the buying public.

*Cook, Perkiss & Liehe v. Northern California Collection Service, Inc.*, 911 F.2d 242, 244 (9th Cir.1990) (quoting *Skil Corp. v. Rockwell Int'l Corp.*, 375 F.Supp. 777, 783 (N.D.Ill.1974)).

### a. Hi–Line

In the FASC, Plaintiff asserts that, in its written advertisements and orally at conventions, Hi–Line has made statements that convey the following three false impressions: (1) that there is an affiliation or association with, or approval by, Summit, as to Hi–Line's actions; (2) that there is no difference between the international and domestic models of the Excimer laser systems at issue in the case; and (3) that the international models that Hi–Line sells may be maintained, installed, serviced, and tested by Hi–Line or another party in a manner that makes them safe and reliable. FASC ¶ 50.

The first "false impression" is in fact an attempt to state a claim under § 1125(a)(1)(A), the "false association" prong of § 43(a). The other two "false impressions" are attempts to state claims under § 1125(a)(1)(B), the "false advertising" prong. However, in the FASC, Plaintiff does not draw a fine distinction between the two types of claims. Plaintiff simply refers to Hi–Line's statements as "false or misleading." For the purposes of Hi–Line's motion, the distinction between the statutory provisions is not material (because Hi–Line has not challenged Plaintiff's standing as a competitor). Nevertheless, in the interest of clarity, the Court will follow the statutory scheme in its analysis of Hi–Line's allegedly false or misleading statements.

In the FASC, Plaintiff lists nine "example[s]" of Hi–Line's allegedly false statements. According to Plaintiff, this list is only illustrative, not "exhaustive." Plaintiff's Opposition at 19. Summit alleges that Hi–Line has "made many actionable statements orally and in writing in addition to those described[.]" *Id.* Regardless, the Court will address Plaintiff's "examples" directly for their legal sufficiency.

### (1) Allegedly False Claims Indicating an Affiliation between Hi–Line's Activities and Summit (15 U.S.C. § 1125(a)(1)(A))

#### (a) Hi–Line's Misstatements Described in FASC ¶ 51(a)

In ¶ 51(a) of the FASC, Plaintiff asserts that Hi–Line has orally misrepresented that Hi–Line and Summit have an "agency relationship." Because the Court must accept Plaintiff's allegations as true, this allegation stands.

Additionally, in ¶ 51(a), Plaintiff also alleges that by stating that it *"represents* only those companies who have established a rep-

---

**3.** This is not the only list formulated by the Ninth Circuit. In *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979), the Ninth Circuit cited eight factors: (1) the strength of the plaintiff's mark; (2) the extent to which the goods are related; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the degree of identity of marketing channels used for the goods; (6) the likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines. *See also Metro,* 987 F.2d at 640. Regardless, "the contents of these tests are interchangeable." *Ocean Garden, Inc. v. Marktrade Co., Inc.,* 953 F.2d 500, 506 n. 2 (9th Cir.1991).

utation for quality and fair pricing," Hi–Line also indicates an agency relationship. *See* Exhibit 18 (attached to the FASC) (emphasis added). Drawing all reasonable inferences in Plaintiff's favor, the Court agrees. Hi–Line's statement is within a "Products Catalog" sent to potential customers. Within the catalog is, allegedly, a picture of a Summit machine. Because Summit manufactures some of the used machines Hi–Line sells, the use of the word "represents" gives rise to a reasonable inference of an agency relationship. Because Plaintiff alleges that such an agency relationship does not exist, Plaintiff's false affiliation claim stands.

**(b) Hi–Line's Statements in Invoices Allegedly Implying Some Affiliation with Summit or Some Obligation Summit may have to Third Party Customers**

■ In ¶ 51(b) of the FASC, Plaintiff alleges that in certain invoices, Hi–Line has misrepresented or implied some affiliation between Summit and Hi–Line. *See* FASC ¶ 51(c) and Exhibit 19. For example, in the invoice for Hi–Line's sale to York, Hi–Line represents the following:

(1) Hi–Line warrants the Excimer laser for a specified period of time

(2) Hi–Line is ... not responsible for any adverse or unacceptable medical surgical outcomes as a result of the buyers [sic], or others at his/hers [sic] facility's, use of the laser. All such claims should be addressed to the original manufacturer who is responsible for the design and building of the product.

(3) It is understood that Hi–Line is strictly an agent for resale, having purchased the laser from an existing user or distributor and reselling it to the buyer.

(4) Additional warranties may be purchased from Summit for an additional cost.

Exhibit 19 (attached to the FASC). Plaintiff asserts that, taken together, these statements "are false and misleading because they state, or by implication or material omission leave the misimpression, that Summit will provide warranties to Hi–Line's buyers, is affiliated or associated with, or connected to, Hi–Line and will be responsible for certain third-party claims, when Summit does not and is not." FASC ¶ 51(b).

Giving Plaintiff the benefit of all reasonable inferences, the Court finds that the allegations in ¶ 51(b) are sufficient to state a claim under § 1125(a)(1)(A). First, the invoice directly states that additional warranties may be purchased from Summit. Summit alleges that this is literally false. Second, the use of the words "agent for resale" together with references to Summit gives rise to a reasonable inference that the statement indicates some agency relationship or affiliation and may mislead consumers. Third, Summit asserts that the statement concerning third party liability is literally false. Accordingly, Plaintiff's allegations in ¶ 51(b) are sufficient to state a claim under § 1125(a)(1)(A).[4]

**(2) Allegedly False Factual Claims Concerning the Products (15 U.S.C. § 1125(a)(1)(B))**

**(a) Hi–Line's Statement that the Imported Summit Systems are "Perfectly Reliable" (FASC ¶ 51(c))**

In some of its advertisements, Hi–Line asserts as follows:

With more and more companies entering the market with new, more sophisticated systems, a secondary market is forming for older model lasers in good condition. *A perfectly reliable used Excimer laser* can be purchased for almost half of the current asking price of a new Unit.

FASC ¶ 51(c) & Exhibits 18, 20, and 25 (attached to the FASC) (emphasis added). Plaintiff asserts that this statement is false

---

**4.** Defendant asserts that the statements made in the invoices are not actionable because they are "not material to the purchasing decision, which has already been made." Defendant Hi–Line's Motion at 19. On the basis of Plaintiff's current allegations, this may or may not be true. First, it is unclear at what stage in the buyer-seller rela-

tionship this invoice was passed. In addition, the statements in the invoice might in fact be material to the purchasing decision in so far as whether the buyer actually decides to accept the goods upon delivery. In short, these are not issues for a 12(b)(6) motion.

or misleading because it "leaves the misimpression that ... the Summit lasers offered for sale by Hi–Line are perfectly reliable, when the lack of proper installation, service, testing, parts and gas means they are not reliable." FASC ¶ 51(c).

Defendant Hi–Line asserts that this statement is not actionable under the Lanham Act because it is mere "puffery" or opinion stated in general terms, not a specific statement of fact about the attributes of the product. As such, and as a matter of law, the statement is not a material statement expected to induce reasonable consumer reliance. *See* Defendant Hi–Line's Motion at 15 (citing *Cook,* 911 F.2d at 246).

 Puffery is often described as "involving outrageous generalized statements, not making specific claims, that are so exaggerated as to preclude reliance by consumers." *Cook,* 911 F.2d at 246 (citing *Metro Mobile CTS, Inc. v. Newvector Communications, Inc.,* 643 F.Supp. 1289 (D.Ariz.1986), *rev'd without opinion,* 803 F.2d 724 (9th Cir.1986)).[5] In the FTC context, the Ninth Circuit has also defined "puffery" as "claims [which] are either vague or highly subjective." *Cook,* 911 F.2d at 246 (quoting *Sterling Drug, Inc. v. Federal Trade Commission,* 741 F.2d 1146, 1150 (9th Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 143 (1985)); *see also* 3 McCarthy, § 27.04[4][d] (" 'Puffing' may also consist of a general claim of superiority over a comparative product that is so vague, it will be understood as a mere expression of opinion.' "). Thus, "advertising which merely states in general terms that one product is superior is not actionable." *Cook,* 911 F.2d at 246 (quoting *Smith–Victor Corp. v. Sylvania Electric Products, Inc.,* 242 F.Supp. 302, 308–09 (N.D.Ill.1965)); *see also Lipton v. Nature Co.,* 71 F.3d 464, 474 (2d Cir.1995) ("Subjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act"). However, "misdescriptions of specific or absolute characteristics of a product are actionable." *Cook,* 911

F.2d at 246 (quoting *Stiffel Co. v. Westwood Lighting Group,* 658 F.Supp. 1103, 1115 (D.N.J.1987)). Furthermore, the Ninth Circuit has expressly authorized the use of the 12(b)(6) motion to dismiss to determine whether or not a statement is non-actionable puffery. *Cook,* 911 F.2d at 245.

 The Court agrees that Hi–Line's statement that the used Excimer lasers are "perfectly reliable" is mere puffery, not actionable under the Lanham Act. In stating that the used machines are "perfectly reliable," Hi–Line clearly does not literally mean that the machines are "100% reliable," which would mean they *never* break down. Indeed, in light of the mere existence of Summit technicians, Plaintiff admits that even the new machines are not "100% reliable." Even the new machines require *some* service. In the context of the Hi–Line advertisement, "perfectly reliable" is more reasonably a claim that the used machines are *as reliable* as the new machines—a statement akin to a general claim of product superiority. As such, the phrase is mere puffery.

Furthermore, to the extent that "reliable" is meant to convey simply that the machine functions, this is also puffery. The word "reliable" is inherently vague and general—in common parlance akin to a statement that the machine is "fine." In the context of the entire advertisement, the phrase "perfectly reliable" is not couched in terms that would indicate independent verifiability. *See, e.g., Stiffel Co. v. Westwood Lighting Group,* 658 F.Supp. 1103, 1114–15 (D.N.J.1987) (claims of superiority not puffing when accompanied by statistical results of purportedly independent survey). Rather, it is simply a vague statement that the machines are "reliable," a claim incapable of objective verification and not expected to induce reasonable consumer reliance. *See, e.g., Thompson Medical Co., Inc. v. Ciba–Geigy Corp.,* 643 F.Supp. 1190, 1199–1200 (S.D.N.Y.1986) (phrase "Lose Weight Fast" found to be non-actionable puffery).

---

5. Prosser and Keeton have stated that "[t]he 'puffing' rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific." W. Page Keeton, et al., *Prosser and Keeton on the* *Law of Torts* § 109, at 756–57 (5th ed. 1984) (quoted in *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 945 (3d Cir.1993)).

**932**

Accordingly, to the extent that Plaintiff's first claim for relief against Hi–Line relies on the statement that the Hi–Line used machines are "perfectly reliable," it is dismissed.

### (b) Hi–Line's Statements Concerning "Service Engineers"

■ In ¶ 51(d) of the FASC, Plaintiff alleges that in certain invoices and orally, Hi–Line states that the used Summit systems "will be installed by a 'service engineer' as arranged by Hi–Line, and that such person will 'show you how to operate it.'" FASC ¶ 51(d) and Exhibit 21 (attached to the FASC). In addition, Hi–Line also provides additional servicing through the "service engineer." *Id.* Plaintiff contends that these statements are false and misleading "because they state, or by implication or material omission leave the false impression that, a 'service engineer' identified by Hi–Line is competent properly to install, maintain, service and test the Summit laser offered for sale by Hi–Line, when this is false." FASC ¶ 51(d).

To the extent that the statements imply that the "service engineers" are "competent," [6] the Court finds that this is a general matter of opinion, not actionable under the Lanham Act. First of all, within the context of the invoice, "competence" may mean that the Hi–Line "service engineers" are *as* competent as the Summit engineers. As with "perfectly reliable," this type of innocuous comparison is mere puffery. Second, if Hi–Line means that the engineers are simply "competent" (not in comparison to the Summit engineers), this is far too vague, subjective, and incapable of verification to be actionable under the Lanham Act. *Cook,* 911 F.2d at 246.

Accordingly, to the extent that Plaintiff's first claim for relief against Hi–Line relies on statements listed in FASC ¶ 51(d), it must be dismissed.

### (c) Hi–Line's Statements that it may Lawfully Import Used Summit Lasers

In ¶ 51(e) of the FASC, Summit alleges that on various occasions orally, and in a sales catalog, Hi–Line has represented that it "may lawfully import previously owned Summit lasers." FASC ¶ 51(e) and Exhibit 22 (attached to the FASC). Plaintiff asserts that this statement is false or misleading "because it states, or by implication or material omission leaves the false impression that, Hi–Line is lawfully entitled to import Summit lasers when it is not and has been so advised by the FDA." FASC ¶ 51(e). Furthermore, Plaintiff alleges that to the extent that Hi–Line has based the statement on an opinion of counsel, it is misleading because the opinion was formed in response to FDA warning letters stating that such importation was illegal. Hi–Line asserts that this statement is not actionable because it invades the FDA's exclusive jurisdiction over violations of the FDCA.

In its original Complaint, Plaintiff alleged that Defendants violated § 43(a) of the Lanham Act by failing to disclose that (1) the used Summit systems are not approved by the FDA; (2) that the used or modified systems are materially different from the FDA-approved systems; (3) that Summit has not serviced the machines and cannot do so under FDA regulations; (4) that proper maintenance and training is of critical importance; and (5) that Defendants cannot provide the required Summit service or training. *See Summit,* 922 F.Supp. at 305–06. Ultimately, Plaintiff's original allegations all "turn[ed] on whether Defendants have failed to disclose the allegedly illegal status of their re-imported systems, or whether Defendants have failed to disclose that, under FDA regulations, Summit has not been able to maintain the machines or train users." *Summit,* 922 F.Supp. at 306.

■ In the prior Order, the Court rejected these allegations, finding them to be impermissible private vehicles for enforcing the FDCA and FDA regulations. *Id.* at 305–06. As explained in the prior Order, under 21 U.S.C. § 337(a), the FDCA provides that "all such proceedings for the enforcement, or to restrain violations, of [the Act] shall be by

---

6. Merely stating that a service engineer will install and service the equipment does not necessarily imply that the service engineer is "competent."

and in the name of the United States." Accordingly, there is no private right of action to enforce the provisions of the FDCA or FDA regulations. *See Summit,* 922 F.Supp. at 305 (citing *Gile v. Optical Radiation Corp.,* 22 F.3d 540, 544 (3d Cir.)), *cert. denied,* —— U.S. ——, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994) (citing *Pacific Trading Co. v. Wilson & Co., Inc.,* 547 F.2d 367, 370 (7th Cir.1976) and other cases); *see also Fender v. Medtronic, Inc.,* 887 F.Supp. 1326, 1329 (E.D.Cal.1995) (the FDCA "gives the FDA comprehensive regulatory authority over medical devices.").

■ Following *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130 (4th Cir.1993), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994) and *Sandoz Pharmaceuticals v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3d Cir.1990), the Court found that Plaintiff's Lanham Act § 43(a) claims "strayed too close to the exclusive enforcement domain of the FDA." *Summit,* 922 F.Supp. at 306. The Court held that "absent an affirmative misrepresentation that a drug had been officially *approved* by the FDA, a Lanham Act claim alleging that the defendant had failed to disclose FDA non-approval could not stand." *Summit,* 922 F.Supp. at 306. In essence, such a claim would allow a private litigant to interfere with the FDA's own investigatory time-table and prosecutorial decision-making. Furthermore, the claim would force the Court to rule directly "on the legality of Defendants' conduct before the FDA has had a chance to do so." *Id.; see also id.* ("A Lanham Act cause of action cannot stand if it alleges that a defendant has failed to disclose the *fact* of FDA non-approval, when the FDA has not yet determined whether or not the product in question has been approved."). In other words, the Lanham Act does not allow a federal court to "determine

preemptively how a federal agency will interpret and enforce its own regulations." *Sandoz,* 902 F.2d at 231; *see also Dial A Car, Inc. v. Transportation, Inc.,* 82 F.3d 484, 490 (D.C.Cir.1996) (in an analogous case, Lanham Act could not be used as "back-door method" of interpreting and enforcing administrative regulations).

■ However, false statements are actionable under the Lanham Act, even if their truth may be generally within the purview of the FDA. For example, in *Mylan,* the defendant had allegedly falsely represented that its product was "bioequivalent" to another product and entitled to "AB" rating from the FDA. The plaintiff alleged that the data for the defendant's bioequivalence studies was fraudulent. Although FDA regulations do define "bioequivalence," the Fourth Circuit allowed the action to proceed because the defendant's statement of "bioequivalence" was literally false. *Mylan,* 7 F.3d at 1138. Further, the factual question of "bioequivalence" was a scientific matter that could be resolved without reference to a particular interpretation of FDA regulations. Similarly, in *Grove Fresh Distributors, Inc. v. The Flavor Fresh Foods, Inc.,* 720 F.Supp. 714, 715 (N.D.Ill.1989), although FDA regulations defined "100% pure orange juice," the Court could determine the commercial definition of "pure" orange juice without performing an authoritative interpretation and direct application of FDA regulations. *See also Energy Four, Inc. v. Dornier Medical Systems, Inc.,* 765 F.Supp. 724 (N.D.Ga.1991) (Lanham Act claim allowed in case where no need to directly interpret or apply FDA regulations and where party had affirmatively represented FDA approval).[7]

By contrast, in *Sandoz,* the matter in question was solely governed by an interpretation of FDA regulations. The *Sandoz* plaintiff

---

**7.** In addition, as stated above, an affirmative misrepresentation that a product has "FDA approval" is actionable under the Lanham Act (as opposed to a failure to disclose non-approval). *See Mylan,* 7 F.3d at 1139; *see also Performance Industries Inc. v. Koos Inc.,* 18 U.S.P.Q.2d 1767, 1770–71, 1990 WL 161253 (E.D.Pa.1990) (affirmative misrepresentation of "EPA approval" actionable under the Lanham Act). Such a misrepresentation is actionable because it clearly misstates a fact and does not require an interpretation or application of FDA regulations. "FDA approval," like "EPA approval" conveys the message that the product has obtained specific regulatory approval, that the product has met specific standards set by the agency, and that the agency has affirmatively and officially informed the party that the product has been "approved." Therefore, a court can test the truth of the statement "FDA approval" without any need to interpret FDA regulations. The question will simply be whether the FDA official conferred "approval" or not.

alleged that the defendant had falsely labelled an ingredient as "inactive" when FDA standards required the ingredient be labelled as "active." The Third Circuit found that such an allegation could not stand because it was a direct claim of misbranding, entirely governed by FDA regulations, concerning a subject that the FDA had not yet resolved.[8] The *Sandoz* court held that "[b]ecause agency decisions are frequently of a discretionary nature or frequently require expertise," the court would not preempt the exercise of that discretion by directly interpreting and applying FDA regulations via a Lanham Act claim. *Sandoz,* 902 F.2d at 231. Otherwise, the court would be forced to "usurp [the] administrative agenc[y]'s responsibility for interpreting and enforcing potentially ambiguous regulations." *Id.*

In its advertising, Hi–Line allegedly states that "[o]ur council [sic] Mr. William Appler has advised that we may import previously owned lasers." FASC ¶ 51(e) and Exhibit 22. In essence, Hi–Line is affirmatively communicating to its consumers that it believes that the importation of the Summit lasers is legal. Plaintiff asserts this is false. However, in order for this Court to test the truth of Defendant's apparent claim that it can legally import the Summit lasers, the Court would be required to perform an "original interpretation" of the FDA regulations governing this area. *Sandoz,* 902 F.2d at 231. In other words, the Court would be required to determine whether Hi–Line is legally importing used Summit lasers under the FDCA and FDA regulations.

Under the *Sandoz* rule and the holding of the prior Order, this the Court cannot do. Simply judging from the correspondence attached as exhibits to the Complaint, it is apparent that the FDA has not yet determined whether to take action against Hi–Line for its importation of used Summit lasers. In essence, the FDA has not yet determined how it will interpret and enforce its own regulations with regard to this question, and the Court must therefore decline to usurp the FDA's authority.[9] Simply put, the proper interpretation and enforcement of the relevant FDA regulation is not an issue properly decided "as an original matter by a district court in a Lanham Act case." *Sandoz,* 902 F.2d at 232.

Accordingly, to the extent that Plaintiff's first cause of action against Hi–Line is founded upon the statements in ¶ 51(e), it must be dismissed.

**(d) Hi–Line's Alleged Statement that the Summit ExciMed UV 200 LA (international) is Identical to the ExciMed UV 200 LA (domestic)**

In ¶ 51(f) of the FASC, Plaintiff asserts that Hi–Line has made the affirmative representation that the international and domestic versions of the ExciMed UV 200 LA lasers are "identical." FASC ¶ 51(f) and Exhibit 23.[10] Hi–Line contends that this claim must fail because it invades the exclusive jurisdiction of the FDA.

The FDA is currently evaluating the degree to which the international and domestic

---

**8.** At the time of the *Sandoz* opinion, the FDA had not "found conclusively that demulcents must be labelled as active or inactive ingredients within the meaning of 21 C.F.R. § 210.3(b)(7)." *Sandoz,* 902 F.2d at 230.

**9.** Plaintiff asserts that the various warning letters and the "Import Alert" (*see* Exhibit 18) indicate that the FDA has finally concluded that Hi–Line is acting illegally. However, as stated in the prior Order, FDA regulatory warning letters do not constitute final agency action. *Summit,* 922 F.Supp. at 306 (citing *Dietary Supplemental Coalition, Inc. v. Sullivan,* 978 F.2d 560, 563 (9th Cir.1992), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2333, 124 L.Ed.2d 245 (1993)). "Indeed, after further review, the FDA *could* ultimately decide that the re-imported systems are so similar to the approved domestic systems" that importation is entirely legal. *Summit,* 922 F.Supp. at 306.

**10.** The statement was allegedly made by Hi–Line in a draft "Patient Informed Consent" form that Plaintiff alleges that Hi–Line provided to its potential purchasers. Hi–Line asserts that Plaintiff cannot utilize this "Informed Consent" form because it is not part of interstate commerce. In other words, Defendant argues that the Court has no jurisdiction to gauge the legality of the "Patient Informed Consent" forms under the Lanham Act. Defendant Hi–Line's Motion at 11 n. 3 (citing *Licata & Co., Inc. v. Goldberg,* 812 F.Supp. 403, 409 (S.D.N.Y.1993)).

On the basis of facts pled by Plaintiff, the Court disagrees. In order to be actionable under the Lanham Act, an advertisement must be used "in commerce." Consistent with the Commerce Clause of the United States Constitution, "in commerce" means "all commerce which may lawfully be regulated by Congress." 15 U.S.C.

*Summit* lasers are similar and whether the international lasers re-imported by Hi–Line require further approval. However, the question of whether the domestic and international lasers are "identical" is a factual one that can be resolved without the interpretation or application of FDA regulations. Accordingly, this Court's inquiry into whether Hi–Line's statements are false does not tread on the FDA's exclusive domain. Therefore, Plaintiff's allegation in FASC ¶ 51(f) that Hi–Line has falsely claimed that the lasers are identical must stand.[11]

**(e) Hi–Line's Alleged Statement Concerning a Physician's Ability to Use the Machine Regardless of FDA Approval**

■■■ Also in ¶ 51(f) of the FASC, Plaintiff asserts that in the same "Patient Informed Consent" form, allegedly distributed by Hi–Line, Defendant states that the FDA "permits a physician to use an approved device such as the ExciMed UV 200 LA ... for any use for which it is capable, whether that indication is approved [by FDA] or not." FASC ¶ 51(f) and Exhibit 23. Again, Hi–Line contends that this statement is not actionable on a Lanham Act claim because it invades the exclusive jurisdiction of the FDA.

The truth or misleading nature of this statement depends on two steps. First, be-

cause the Consent Form does not distinguish between the ExciMed UV 200 LA (international) and the ExciMed UV 200 LA (domestic), the Court must determine whether or not they are, in fact, identical. As stated above, this the Court may do. However, the second step creates the problem. Whether the FDA actually permits physicians to use the ExciMed lasers sold by Hi–Line "for any use for which it is capable, whether that indication is approved or not" is an issue requiring a direct interpretation and application of FDA regulations. Because this is a matter for the FDA (in the first instance), and not for a district court on a Lanham Act claim, this allegation cannot stand.

Accordingly, to the extent that Plaintiff's first claim for relief against Hi–Line rests on the statement alleged in ¶ 51(f) that. Hi–Line misrepresents the legality of a physician's use of Hi–Line's Summit lasers, it must be dismissed.

**(f) Hi–Line's Statements in its Press Releases**

■■■ In ¶ 51(g) of the FASC, Plaintiff alleges that Hi–Line has made the following misrepresentations that:

given the FDA's approval of certain Summit Excimer Laser Systems, buyers in the

---

§ 1127. However, despite the plain meaning of § 1127, the court in *Licata* held that the Lanham Act interstate commerce requirement clause "does not extend to the full outer limits of the commerce power." *Licata*, 812 F.Supp. at 409. In light of § 1127, the Court does not find *Licata* to be a correct statement of the law. *See Thompson Tank & Mfg. Co., Inc. v. Thompson*, 693 F.2d 991, 993 (9th Cir.1982) (citing § 1127). Indeed, it appears that the *Licata* court never cited 15 U.S.C. § 1127, the relevant statute.

Thus, under § 1127, a Lanham Act claim may be brought with regard to any statement used in such a way as to "substantially affect" interstate commerce. *United States v. Lopez*, —— U.S. ——, ——, 115 S.Ct. 1624, 1630, 131 L.Ed.2d 626 (1995); *United States v. Staples*, 85 F.3d 461, 463 (9th Cir.1996), *amended by* —— F.3d ——, 1996 WL 359984 (9th Cir. June 28, 1996); *United States v. Pappadopoulos*, 64 F.3d 522, 526 (9th Cir.1995). Further, a Lanham Act claim may be brought with regard to advertising activities that, while intrastate, may have a substantial effect on the interstate economy in the aggregate. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1630 (citing *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)).

In the FASC, Plaintiff alleges that Defendant Hi–Line has provided the forms to "prospective purchasers." There is no indication that this distribution has been entirely inside one state— indeed from other parts of the FASC, the opposite inference is more reasonable. Even if the distribution were in only one state, the resulting sale of Hi–Line used Summit lasers could substantially affect the admittedly interstate business of optic laser equipment sales. Accordingly, at the pleading stage, the Court must find that Plaintiff has met the jurisdictional "interstate commerce" requirement as to Hi–Line's distribution of the "Patient Informed Consent" forms.

11. Defendant's additional arguments to the contrary are not persuasive. First, at this stage, the Court cannot determine that the machines are in fact identical. In other words, at the 12(b)(6) stage, the Court cannot say that the statement is true as a matter of law, as Defendant appears to invite the Court to do. *See* Defendant Hi–Line's Motion at 21–25. Second, the Court cannot determine, as a matter of law, that the "Patient Informed Consent" form was never distributed to potential consumers, or that the statements were not made by Hi–Line. These are questions for summary judgment, not 12(b)(6).

United States are permitted by the FDA to perform "FDA approved" procedures on the international models of Summit Excimer Laser Systems and that these products can be serviced by Summit or by "HI–LINE MEDICAL designated service personnel."

FASC ¶ 51(g) and Exhibit 24. Plaintiff asserts that these statements are false and misleading because they leave the misimpression that FDA approval applies to the lasers sold by Hi–Line.

The Court agrees. While this is not a bald representation of FDA approval, it comes very close. The November 9, 1994 Press Release (attached to the FASC as Exhibit 24) begins by stating that Hi–Line has "aggressively entered the previously owned Excimer Laser business[.]" Then, in the next sentence, the Release states that "[t]he FDA has granted 'conditional' approval to one Excimer laser manufacturer at the FDA Panel Meeting[.]" There is no qualification that the Excimer lasers sold by Hi–Line are not covered by this official approval. Without such a qualification, the statement leaves the false impression that the Excimer lasers sold by Hi–Line are "FDA approved," which is allegedly not true.

Unlike the statements alleged in the original Complaint, Hi–Line has not simply placed its used Summit lasers without disclosing nonapproval. As held in the prior Order, such a claim is not actionable under the Lanham Act. Rather, Hi–Line's Press Release could be construed as an affirmatively misleading statement that the Excimer lasers sold by Hi–Line have, in fact, been approved by the FDA. Such a claim is cognizable under the Lanham Act. *Summit*, 922 F.Supp. at 306. Accordingly, Plaintiff's allegation under ¶ 51(g) may stand.

**(g) Hi–Line's Alleged Statements that the FDA Permits the Domestic Use of Foreign Models of Summit Excimer Laser Systems if They are Serviced by Summit or "Hi–Line Designated Personnel"**

■ Although Plaintiff has not given specific examples (except for Exhibit 24—where

"Hi–Line Designated Service Personnel" are mentioned), Plaintiff alleges that Hi–Line has stated that the FDA permits the domestic use of foreign Summit models if they are serviced by Summit or "Hi–Line designated personnel." FASC ¶ 51(h).

The question of who may legally repair Summit equipment is clearly a matter requiring the interpretation and application of FDA regulations. Accordingly, Plaintiff may not bring a direct action alleging that Hi–Line violates § 43(a) by asserting that Hi–Line personnel can legally service Summit lasers. Paragraph ¶ 51(h) also contains the allegation that Hi–Line asserts that the FDA "permits" the domestic use of the foreign Summit models. This allegation also may not stand. As stated above, a statement of "FDA approval" is actionable because it is verifiable without reference to FDA regulations. "FDA approval" implies an official regulatory act certifying a product is "approved." However, Hi–Line's alleged statement that the FDA "permits" domestic use is far more nebulous and would certainly require interpretation and application of FDA regulations.[12] Accordingly, Plaintiff's allegations under FASC ¶ 51(h) cannot stand.

**(h) Hi–Line's Alleged Statement that the FDA Permits the Importation Into, and Commercial Use in, the United States of Foreign Summit Lasers**

■ In ¶ 51(i) of the FASC, Plaintiff alleges that Hi–Line has misrepresented that the FDA permits the "importation into, and commercial use in, the United States of foreign models of Summit Excimer Laser Systems." For the reasons discussed in sections II.B.1.a.(2)(c) and II.B.1.a.(2)(g), this allegation cannot stand under the Lanham Act. Accordingly, it is dismissed.

**(i) Hi–Line's Alleged Statements that Summit Lasers Can Receive Proper Installation, Service, Maintenance, and Testing**

■ In ¶ 51(j) of the FASC, Plaintiff contends that Hi–Line has misrepresented

---

**12.** For example, the Court would have to determine the circumstances under which the FDA "permits" the use of a product that has not be officially "approved," and whether the re-imported Hi–Line lasers meet that standard.

that its lasers "have received and can receive proper installation, service, maintenance and testing." FASC ¶ 51(j). To the extent that this allegation can be interpreted to mean that Hi–Line has misrepresented that it may *legally* service used Summit machines, it cannot stand. Such an allegation would require an original interpretation and application of FDA regulations, not cognizable under the Lanham Act. To the extent that the allegation can be interpreted to mean that Hi–Line has misrepresented that it may *competently* service used Summit machines, it cannot stand because such a statement is mere puffery (*see* discussion above). Accordingly, to the extent that Plaintiff's first claim against Hi–Line rests on ¶ 51(j), it must be dismissed.

### (3) Unspecified Other Allegations of False Advertising

 Plaintiff asserts that the allegations discussed above are merely examples, "illustrative, not exhaustive." Plaintiff's Opposition at 19. Indeed, in ¶ 50, Plaintiff asserts that Hi–Line "has made numerous false or misleading statements about Summit Excimer Laser Systems." Plaintiff further alleges that the statements misleadingly convey the following three basic impressions: (1) that there is an affiliation or association between Summit and Hi–Line's actions; (2) there is no difference between the international and domestic models; and (3) that the international models Hi–Line sells may be maintained, installed, serviced and tested by Hi–Line in a manner that makes them safe and reliable. FASC ¶ 50. Lastly, in ¶ 51(a), Plaintiff states that the specific allegations are placed "[b]y way of example only[.]"

 Under Federal Rule of Civil Procedure 8(a), the Court finds these general allegations to be *sufficient to give Defendant "fair notice"* of Plaintiff's claim. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 165–67, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993). Clearly, Rule 8(a) does not require Plaintiff to set forth specific allegations or evidentiary facts. All that is required is a "short and plain statement" of Plaintiff's claim for relief.

However, the Court does note that to the extent that Plaintiff's unspecified allegations match or mirror those discussed above, the Court will treat them similarly.

### (4) Summary with Regard to Hi–Line

To recapitulate, with regard to the specific allegations supporting Plaintiff's first cause of action against Hi–Line, the Court makes the following rulings:

1.) Defendant's motion is DENIED as to: ¶ 51(a) (misstatements re: agency), ¶ 51(b) (misstatements re: agency and affiliation in the invoice), ¶ 51(f) (identical lasers); and ¶ 51(g) (press release statements re: FDA approval);

2.) Defendant's motion is GRANTED as to: ¶ 51(c) ("perfectly reliable"), ¶ 51(d) (competent service engineers), ¶ 51(e) (lawful importation of previously owned lasers), ¶ 51(f) (statements re: FDA's rules regarding physician use of approved devices), ¶ 51(h) (FDA permits domestic use if serviced by Summit or Hi–Line personnel), ¶ 51(i) (FDA permits importation), and ¶ 51(j) (proper installation and service). To the extent that Plaintiff's first claim for relief against Hi–Line rests on these allegations, it is dismissed;

3.) With regard to the substance of Plaintiff's unspecified allegations described in ¶ 50, the Court's order will apply equally to them.

### b. Ellis

In the FASC, Plaintiff asserts that Defendant Ellis has made numerous false or misleading statements concerning the Summit ExciMed UV 200LA (international) that Ellis allegedly possesses. According to Plaintiff, Ellis has stated or implied the following general misrepresentations: (1) that the international and domestic models of the ExciMed UV 200LA are the same; (2) that the ExciMed UV 200LA (international) has been properly serviced and tested; (3) that the ExciMed UV 200LA has been approved by the FDA; and (4) that the ExciMed UV 200LA is a new laser. As with its allegations against Hi–Line, Plaintiff has also listed several "examples" of Ellis' false or misleading

statements. Again, according to Plaintiff, this list is only illustrative, not "exhaustive." Plaintiff's Opposition at 19. Nevertheless, the Court will address Plaintiff's "examples" directly for their legal sufficiency.

Before turning to the specific allegations, however, the Court must address one threshold matter. Defendant Ellis asserts that under Ninth Circuit law, Summit has no standing to sue Ellis for false advertising because they are not in a competitive relationship, but rather one of purchaser-seller. Ellis contends that while Summit is in the business of manufacturing and selling laser equipment, Ellis is merely a doctor who happens to have purchased a used Summit machine. As stated by Ellis, "Summit is not an ophthalmologist and does not practice ophthalmic medicine in Northern California." Defendant Ellis' Motion at 18.

"A false advertising claim implicates the Lanham Act's purpose of preventing unfair competition." *Stanfield v. Osborne Industries, Inc.*, 52 F.3d 867, 873 (10th Cir.), *cert. denied*, — U.S. ——, 116 S.Ct. 314, 133 L.Ed.2d 217 (1995) (citing 15 U.S.C. § 1127). Thus, in *Halicki v. United Artists Communications, Inc.*, 812 F.2d 1213 (9th Cir.1987), the case primarily relied upon by Ellis, the Ninth Circuit held that § 43(a) of the Lanham Act is confined to remedy "injur[ies] to a competitor." *Id.* at 1214; *contra Camel Hair & Cashmere Institute, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 11 (1st Cir.1986) ("there appears to be a general consensus that the plaintiff does not have to be a competitor in order to have standing to sue" under § 43(a) of the Lanham Act); 3 McCarthy § 27.04[3][e] (calling the *Halicki* decision an "aberration in the history of court interpretation of § 43(a)").

In *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093 (9th Cir.1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1047, 122 L.Ed.2d 355 (1993), the Ninth Circuit clarified the *Halicki* standing rule, stating that in a false advertising case under 15 U.S.C. § 1125(a)(1)(B), the plaintiff

must allege "a discernibly competitive injury" in order to have standing. *Id.* at 1109; *see also Barrus v. Sylvania*, 55 F.3d 468, 470 (9th Cir.1995) (under § 1125(a)(1)(B), false advertising must be "harmful to the plaintiff's ability to compete with the defendant."). By contrast, the *Waits* court held that in a trademark infringement or "false association" case under 15 U.S.C. § 1125(a)(1)(A), there was no need to allege competitive injury. *Waits*, 978 F.2d at 1110. In such a case, the trademark holder is attempting to "control[] the commercial exploitation of his or her identity[,]" and not necessarily prevent unfair competition.

■ Plaintiff's allegations against Ellis fall entirely within the first category—traditional false advertising or unfair competition under 15 U.S.C. § 1125(a)(1)(B).[13] All of Plaintiff's claims against Ellis center on his alleged misrepresentations concerning the "nature, characteristics, [or] qualities" of the laser systems he possesses. § 1125(a)(1)(B). None of Plaintiff's allegations against Ellis concern "the affiliation, connection, or association of [Defendant] with another person, or as to the origin, sponsorship, or approval of [Defendant's] goods, services, or commercial activities[.]" § 1125(a)(1)(A). Accordingly, in order to have standing to sue Ellis, Plaintiff must allege "a discernibly competitive injury" caused by Ellis' conduct.

Plaintiff asserts that it has made this allegation. In ¶ 23 of the FASC, Plaintiff alleges that "Summit's goal is to be a major participant in *all aspects* of the developing multi-billion dollar market for laser alternatives to glasses, contact lenses and manual ophthalmic surgery." FASC ¶ 23 (emphasis added). As part of its attempt to become a "major participant in all aspects of the developing multi-billion dollar market," Summit claims that it has opened "Summit Vision Centers," where it provides laser surgery to patients. Plaintiff's Opposition at 40. Summit also asserts that these Centers are in California, in direct competition with Ellis. *Id.*

---

13. Accordingly, Ellis' arguments concerning the "first sale" doctrine are inapposite. Plaintiff does not allege that Ellis' statements falsely indicate some association or affiliation between Ellis and Summit. Further, unlike the original Complaint, the FASC contains no further allegation of trademark infringement. Accordingly, the "first sale" doctrine has no application to Plaintiff's claim against Ellis.

However, the FASC does not mention the "Summit Vision Centers" at all. The FASC primarily describes Summit as a seller of "products and services," such as the Excimer laser. *See* FASC ¶ 24. Plaintiff also alleges that it "has become a world leader in the development, manufacture, sale and servicing of trademarked state-of-the-art laser systems. These systems are designed to permit ophthalmologists to correct common human vision disorders[.]" FASC ¶ 17. Further, Summit alleges that it trains physicians in the use of the Summit systems. FASC ¶ 29. Nowhere in the FASC does Summit allege that it has actually opened clinics to compete with other ophthalmologists.

■ Nevertheless, giving Plaintiff the benefit of the doubt (as the Court must do on a 12(b)(6) motion), "all aspects" of the laser optics business could reasonably include some form of vision center in closer competition with Ellis.[14] Accordingly, the Court will not dismiss Plaintiff's Lanham Act claim against Ellis at this stage.[15]

Having disposed of the standing issue for now, the Court now turns to Ellis' alleged misrepresentations.

## (1) Statements Indicating FDA Approval

■ Plaintiff alleges that Ellis has repeatedly indicated that the ExciMed machine

---

14. Summit's other arguments in favor of standing confuse the difference between a "false association" claim under 15 U.S.C. § 1125(a)(1)(A) and a "false advertising" claim under § 1125(a)(1)(B) and rest on a dubious interpretation of the governing Ninth Circuit cases—*Halicki*, *Waits*, and *Barrus*. Essentially, Plaintiff argues that because the Ninth Circuit declined to expand the *Halicki* rule to a false endorsement claim in *Waits*, Plaintiff has standing here. Opposition at 41. Further, Plaintiff argues that it has standing because it is "competing with defendants over promoting the new laser procedures." *Id.* Finally, Summit appears to liken Ellis to the "wrongful appropriator" in *Waits*, arguing that Summit and Ellis are in competition for the use of Summit's "name or identity." Summit's first argument is a non-sequitur. *Waits* expressly distinguished a "false endorsement" claim (where no competitive injury is required) from a "false advertising" claim (where some discernable injury is required). Thus, the *Waits* court expressly approved the use of the *Halicki* rule in § 1125(a)(1)(B) "false advertising" cases. In order to have standing to bring a false advertising claim, the plaintiff must be "a competitor in the traditional sense" with the defendant.

Plaintiff's second and third arguments are related and similarly unpersuasive. In "promoting the new laser procedures," Ellis and Summit are not competitors. In a sense, they are allies—both seek to promote the idea and use of the Excimer systems. Arguably, Ellis' use and promotion of his imported Excimer system may affect Plaintiff's sales. Other physicians may decide to similarly buy used imported machines, to the detriment of Summit. Patients or other physicians may decide they dislike Summit machines on the basis of their experience with Ellis' imported machine, also to the detriment of Summit.

However, acceptance of these allegations as sufficient to establish competitive injury would destroy the Ninth Circuit's distinction between "false advertising" and "false association" claims and alter the Ninth Circuit's "traditional"

definition of "competition." *Waits*, 978 F.2d at 1110. Under this theory, any two parties with some economic nexus, or whose conduct has some economic effect upon the other, could be construed as "competitors." *Waits*, *Halicki*, and *Barrus* do not permit such a deconstruction of the "traditional sense" of the term, "competitor." Otherwise, there would be no need for a distinction in the standing requirements between a false advertising claim under 15 U.S.C. § 1125(a)(1)(B) and a false association claim under 15 U.S.C. § 1125(a)(1)(A). As recognized by *Waits*, the deconstructionist view of "competitor" could see competitive links even between such diverse parties as Tom Waits and Frito–Lay. *Waits*, 978 F.2d at 1110.

The "traditional" view of "competition" does not permit such a broad view. In the "traditional sense," "[c]ompetitors are '[p]ersons endeavoring to do the same thing and each offering to perform the act, furnish the merchandise, or render the service better or cheaper than his rival.'" *Fuller Bros., Inc. v. Int'l Marketing, Inc.*, 870 F.Supp. 299, 303 (D.Or.1994) (quoting *Black's Law Dictionary*, 5th ed., p. 257). If Summit has not entered the ophthalmology business, Summit is not "endeavoring to do the same thing" as Ellis. Conversely, if Ellis is not selling or servicing Excimer lasers, Ellis is not "endeavoring to do the same thing" as Summit. Absent such a similarity in endeavors, Summit and Ellis are simply not competitors in the "traditional sense." *Waits*, 978 F.2d at 1110.

15. However, the Court does note that the question of Plaintiff's standing to sue Ellis should be resolved soon. Because standing is a jurisdictional question, the Court encourages Ellis to bring a motion under Federal Rule 12(b)(1) challenging Plaintiff's standing to sue for false advertising under the Lanham Act. In considering such a motion, the Court may look beyond the pleadings and make its own factual determinations concerning jurisdiction, including the question of Plaintiff's standing to sue on a particular claim.

he uses has been approved by the FDA. For example, Plaintiff alleges that the statements in the "Patient's Guide" misleadingly give the false impression that the FDA has approved Ellis' ExciMed UV 200LA laser. FASC ¶ 65(e). Indeed, at the beginning of Chapter 12, the "Patient Guide" states that "the Summit Excimed model has been approved for therapeutic use." Exhibit 26, p. 105. Further, on page 117, as part of the answer sheet to a "True–False" test, the "Patient Guide" states that "only the Summit Excimed laser has been approved for therapeutic use by the FDA[.]" Exhibit 26, p. 115. In addition, the patient consent statement accompanying the "Patient Guide" states that "Excimer laser keratectomy is presently only approved by the FDA to remove corneal surface scars and irregularities[.]" Exhibit 26, p. 117. On page 128, the Guide states that "[t]he 'Excimed' excimer laser (Summit Technology, Inc.) that Dr. Ellis will be using in the surgical procedure to correct your eyesight has been approved by the FDA only for PTK[.]" Exhibit 26, p. 125. Ellis makes the identical statement in a LASIK patent consent brochure. See Exhibit 27, p. 140 and FASC ¶ 66.

Further, Plaintiff alleges that on April 7, 1995, Ellis circulated a letter to numerous doctors in which he stated that "[t]he FDA has recently approved the Excimed, Excimer Laser" and that he possessed such a laser. See FASC ¶ 67 and Exhibit 28. In addition, Plaintiff alleges that on November 1, 1995, Ellis issued a press release heralding the FDA approval of the ExciMed for certain uses, and stating that "Ellis has been the first in the Bay Area to use the excimer laser with hundreds of laser cases[.]" FASC ¶¶ 68–69 and Exhibit 29. Plaintiff alleges a number of other, similar statements. See FASC ¶¶ 71–79.

The Court agrees that these statements give the impression that the ExciMed laser used by Ellis has been approved by the FDA. There is no qualification that the Excimer laser actually used by Dr. Ellis is not covered by the official FDA approval. Without such a qualification, the statement leaves the false impression that the Excimer lasers used by Ellis are "FDA approved," which is allegedly not true. For the reasons discussed above, such a claim is actionable under the Lanham Act. See also Summit, 922 F.Supp. at 306.[16]

### (2) Ellis' Alleged Statements Concerning a Physician's Ability to Use the Machine Regardless of FDA Approval

■ Plaintiff alleges that statements in the "Patient Guide" and other places "inaccurately describe FDA policy concerning the use of an approved device for a purpose other than the one for which it was approved, and incorrectly state that Ellis may, consistent with FDA rules, properly use the ExciMed UV 200LA (international) for PRK." Id. For the reasons discussed above (see Section II.B.1.a.(2)(e), supra), this claim is not cognizable under the Lanham Act.

### (3) Ellis' Allegedly Implied Statements that his ExciMed is Properly Serviced

In ¶ 81(b) of the FASC, Plaintiff asserts that Ellis has improperly implied or stated that his machine is "properly serviced and maintained[.]" For the reasons discussed above (see Section II.B.1.a.(2)(i), supra), this claim fails.

### (4) Ellis' Alleged Statement that He Possesses a New Summit Machine

■ In ¶ 81(c) of the FASC, Plaintiff alleges that Ellis has misrepresented that his machine is new, when it is, in fact, used. This is clearly an actionable claim under 15 U.S.C. § 1125(a)(1)(B).

### (5) Summary with Regard to Ellis

To recapitulate, with regard to Plaintiff's allegations against Ellis supporting the first claim for relief, the Court makes the following rulings:

1.) To the extent that Plaintiff asserts that Ellis has misrepresented FDA approval of his ExciMed laser, has misrepresented that his machine is identical to

---

**16.** In addition, to the extent that Plaintiff contends that Ellis' statements misleadingly indicate that the domestic and international ExciMed lasers are identical, this claim is also actionable under the Lanham Act.

the domestic Summit ExciMed, or has misrepresented that his machine is new, Defendant Ellis' motion to dismiss the first cause of action is DENIED;

2.) To the extent that Plaintiff alleges that Ellis has misrepresented the legal ability of a physician to use the machine regardless of FDA approval or misrepresented that his ExciMed is properly serviced, Defendant Ellis' motion is GRANTED, and the claims are DISMISSED (*see* FASC ¶¶ 65(b), 65(d), 66, and 81(b)).

### c. York

■ In the FASC, Plaintiff alleges that Defendant York has promoted and advertised his two machines in various false and misleading ways. First, Plaintiff alleges that York is advertising a "custom" laser, developed by York when, in fact, it is really an altered Summit Excimer laser ("reverse palming off" claim). Second, Plaintiff alleges

that York misrepresents that the lasers he uses have been approved by the FDA. Third, Plaintiff alleges that York misrepresents that his lasers are properly installed, manufactured, tested, safe, and effective.[17]

### (1) "Reverse Palming Off" Claim

■ Plaintiff claims that York has advertised and promoted a "custom" device that is actually an altered Summit Excimer laser, without revealing that the machine was actually manufactured by Summit. FASC ¶ 97 and Exhibit 34 (attached to the FASC). Unlike the allegations in the original Complaint, this claim is purely and unmistakably one for the variety of deception known as "reverse palming off," actionable under 15 U.S.C. § 1125(a)(1)(A). It has no necessary reference to FDA regulations. It simply states that York is falsely promoting a machine as his own that is, in fact, a Summit machine. *See, e.g.,* Exhibit 34, p. 167 ("This custom laser was specifically engineered by Dr. York for his patients.").[18] Accordingly, it is action-

---

17. York asserts that Plaintiffs' Lanham Act claims against him must fail because they do not meet the interstate commerce requirement. Giving Plaintiff the benefit of all reasonable inferences, the Court disagrees. As stated above, under 15 U.S.C. § 1127, a Lanham Act claim may be brought with regard to any statement used in such a way as to "substantially affect" interstate commerce, even in the aggregate. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630 (1995) and *Wickard,* 317 U.S. 111, 63 S.Ct. 82. In the FASC, Plaintiff alleges that York has advertised the use of his machines in magazines, newspapers, radio, and on billboards. FASC ¶ 97. York's resulting use of the relatively new laser technology on large numbers of individuals could have an effect on the use of the Excimer lasers nationwide. At the pleadings stage, this reasonable inference is sufficient to meet the interstate commerce requirement. Of course, after further discovery, the parties may desire to revisit this issue.

18. At oral argument, counsel for Defendant York asserted that because Plaintiff's "reverse palming off" claim turns on the definition of "custom," it relies upon an interpretation of the FDCA and therefore must be dismissed. This argument is not persuasive. Plaintiff's "reverse palming off" allegation does *not* necessarily turn on the FDA's definition of "custom." The allegation is simply that York is representing the Summit lasers as entirely his own ("specifically engineered by Dr. York"), without informing consumers that the lasers are primarily made by Summit—a classic "reverse palming off" allegation. The fact that he may or may not have a "custom" device

within the meaning of 21 U.S.C. § 360j(b) does not dispose of the question of whether York has deceived consumers as to the device's origin (under 15 U.S.C. § 1125(a)(1)(A)) by stating that he "specifically engineered" his laser, rather than stating that he altered a Summit machine.

Furthermore, even if the FDA determines that York possesses a "custom" laser, within the meaning of 21 U.S.C. § 360j(b), this merely means that York is exempt from the requirements of § 360d (performance standards) and § 360e (premarket approval). It does not mean that York is exempt from the requirements of 15 U.S.C. § 1125(a). It does not mean that Dr. York can misrepresent to the public that he "specifically engineered" his laser, when it may be, in fact, an altered Summit laser. In other words, even if his altered Summit laser is "custom" under 21 U.S.C. § 360j(b) and York need not obtain premarket approval, this does not give York license to represent that the laser he uses is entirely of his own design and making. Indeed, the term "custom" may have an entirely different meaning in the commercial marketplace than it does within the specific confines of § 360j(b).

At oral argument, counsel for Dr. York also asserted that the Court's ruling placed him in a "Catch 22" situation. If he represented that this was a Summit laser, without stating that it was "custom" made, he might be violating the FDCA and FDA regulations. If he simply states that it is a "custom" device (and assuming that the FDA agrees), without mentioning Summit, then he might violate 15 U.S.C. § 1125(a)(1)(A). However, as mentioned by Plaintiff's counsel in oral

able under the Lanham Act.[19]

**(2) Plaintiff's Claim that York Misrepresents that He Possesses a "Custom" Device Within the Meaning of FDA Regulations**

Plaintiff alleges that York has misrepresented that he possesses a "custom" device, within the meaning of FDA regulations. FASC ¶ 100. For the reasons stated in the prior Order, this claim must fail. *See Summit*, 922 F.Supp. at 306 & n. 4.[20]

**(3) Plaintiff's Claim that York Misrepresents FDA Approval for his Device**

Plaintiff alleges that in consent forms provided to patients, York has misrepresented that his laser has been approved by the FDA for some purposes. FASC ¶ 98–99 and Exhibit 35. The Court need not accept this unreasonable inference as true. The consent form referred to by Plaintiff clearly states that York's laser "has not been approved by the FDA for general use." It is an unreasonable inference to glean from that statement that York represents that the FDA approves his laser for "limited" uses. Further, to the extent that Plaintiff alleges that York is liable under the Lanham Act for failing to reveal FDA non-approval for all uses, this claim is barred by the prior Order. *See Summit*, 922 F.Supp. at 305–06.

**(4) Plaintiff's Claim that York Misrepresents that his Machines are Properly Installed, Manufactured, Tested, Safe, and Effective**

For the reasons discussed above, this claim fails. *See* Section I.B.1.a.(2)(i), *supra*.

**(5) Summary with Regard to York**

To recapitulate, with regard to Plaintiff's first claim for relief against Defendant York, the Court makes the following rulings:

1.) To the extent that Plaintiff asserts a "reverse palming off" claim against York, York's motion to dismiss is DENIED.

2.) Plaintiff's other claims against York under the Lanham Act are DISMISSED.

**2. Plaintiff's Second and Third Claims for Relief for Unfair Competition under Cal.Bus. & Prof.Code §§ 17200 *et seq.* and California Common Law**

In its second and third claims for relief, Plaintiff asserts that Defendants have engaged in unfair competition, in violation of Cal.Bus. & Prof.Code §§ 17200 *et seq.* and California common law. Because these claims are essentially the same against each of the Defendants, the Court address them all together.

Under Cal.Bus. & Prof.Code § 17200, "[u]nfair competition is defined to include 'unlawful, unfair, or fraudulent business practice and unfair, deceptive, untrue or misleading advertising.'" *People v. McKale*, 25 Cal.3d 626, 631–32, 159 Cal.Rptr. 811, 602 P.2d 731 (1979). It is broadly defined to include "anything that can properly be called a business practice and that at the same time is forbidden by law." *McKale*, 25 Cal.3d at 632, 159 Cal.Rptr. 811, 602 P.2d 731 (quoting *Barquis v. Merchants Collection Ass'n*, 7 Cal.3d 94, 113, 101 Cal.Rptr. 745, 496 P.2d 817 (1972)); *see also Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 210–11, 197 Cal.Rptr. 783, 673 P.2d 660 (1983) ("any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200 and 17203").

---

argument, there is always a third option—York can simply tell the entire truth. He can state that the device is a "custom" laser, altered by York himself, but engineered from an imported Summit machine. This solves the "reverse palming off" problem and, if the FDA agrees that it is "custom" within the meaning of 21 U.S.C. § 360j(b), the statement does not violate the FDCA.

19. Further, because the "reverse palming off" claim arises under § 1125(a)(1)(A), Plaintiff clearly has standing.

20. Because this claim does hinge on the FDA's definition of "custom," it is distinguished from Plaintiff's pure "reverse palming off" allegation discussed above.

As support for its § 17200 claim, Plaintiff has listed a variety of "unlawful acts," including violations of the California Sherman Act (Cal. Health & Safety Code §§ 26000 *et seq.*), the California Consumer Legal Remedies Act (Cal.Bus. & Prof.Code § 2234), Cal.Bus. & Prof.Code §§ 17500 *et seq.* (false and misleading statements), and the Lanham Act. In addition, Plaintiff asserts that Defendants have "knowingly obtained lasers from parties, who by contractual restrictions and otherwise, were not permitted to sell them for commercial use or for shipment to the United States."

 Plaintiff's claim against Defendants under § 17200 clearly stands. Under California law, any unlawful business practice, including violations of laws for which there is no direct private right of action,[21] may be redressed by a private action under § 17200. *Committee on Children's Television*, 35 Cal.3d at 210–11, 197 Cal.Rptr. 783, 673 P.2d 660. "It is not necessary that the predicate law provide for private civil enforcement." *Saunders v. Superior Court*, 27 Cal.App.4th 832, 838–39, 33 Cal.Rptr.2d 438 (1994).[22] Thus, under § 17200, Plaintiff may redress violations of the California Sherman Act, California Consumer Legal Remedies Act, the Lanham Act (so long as the Lanham Act claims are not merely vehicles for claims under the FDCA or FDA regulations), and Cal.Bus. & Prof.Code § 17500. Accordingly, Plaintiff's second cause of action for unfair competition in violation of Cal.Bus. & Prof. Code § 17200 *et seq.* is valid.[23] Similarly, because the Court sees no difference between statutory unfair competition and common law unfair competition, Plaintiff's third cause of action is also valid.

**3. Plaintiff's Fourth Claim for Relief for Making False and Misleading Statements in Violation of Cal.Bus. & Prof.Code §§ 17500 *et seq.***

 Finally, Plaintiff alleges that Defendants have made a variety of false and misleading statements in violation of Cal.Bus. & Prof.Code §§ 17500 *et seq.*. Clearly, all the allegedly false or misleading statements actionable under 15 U.S.C. § 1125(a) are actionable under Cal.Bus. & Prof.Code §§ 17500 *et seq.* Accordingly, Plaintiff's fourth claim for relief must stand.

## IV. Conclusion

For all of these reasons, the Court hereby ORDERS that Defendants' motions to dismiss are DENIED in part and GRANTED in part. The Court ORDERS as follows:

1.) With regard to Plaintiff's first claim for relief against Hi–Line, the allegations stated in FASC ¶ 51(c) ("perfectly reliable"), ¶ 51(d) (competent service engineers), ¶ 51(e) (lawful importation of previously owned lasers), ¶ 51(f) (misrepresentations re: FDA rules regarding physician use of approved devices), ¶ 51(h) (FDA permits domestic use if serviced by Summit or Hi–Line personnel), ¶ 51(i) (FDA permits importation), and ¶ 51(j) (installation and service) are DISMISSED.[24] In all other respects, Hi–Line's motion to dismiss the first claim for relief is DENIED;

2.) With regard to Plaintiff's first claim for relief against Ellis, to the extent that Plaintiff alleges that Ellis has misrepresented the legal ability of a physician to use the machine regardless of FDA approval or misrepresented that his ExciMed is properly serviced (*see* FASC ¶¶ 65(b), 65(d), 66, and 81(b)),

---

**21.** This is true unless federal law preempts such an action. Thus, a Plaintiff may not bring a § 17200 claim that is, in fact, an attempt to state a claim under the federal FDCA.

**22.** To the extent that the Court's prior Order may have indicated a contrary rule (*see Summit*, 922 F.Supp. at 316), this Order will serve to clarify any misconception of the Court's position.

**23.** However, the Court does note that Plaintiff's last theory of unfair competition—that Defendants engaged in unfair competition by knowingly buying lasers from entities not privileged to sell them for commercial use or import into the United States—is not a cognizable theory. The Court has found no California cases stating that such an act is unlawful. Arguably, the tort of inducing breach of contract is unlawful, but Plaintiff has not pled that tort.

**24.** With regard to the claims dismissed because they intrude on the exclusive jurisdiction of the FDA, these claims are dismissed without prejudice to a later filing if and when the FDA renders final decisions concerning the issues.

Plaintiff's claims are DISMISSED.[25] In all other respects, Ellis' motion to dismiss the first claim for relief is DENIED;

3.) With regard to Plaintiff's first claim for relief against York, to the extent that Plaintiff asserts a "reverse palming off" claim against York, York's motion to dismiss is DENIED. Plaintiff may proceed on this theory. However, Plaintiff's other claims against York under the Lanham Act are DISMISSED;[26]

4.) With regard to Plaintiff's second, third, and fourth claims for relief, Defendants' motions are DENIED.

**SO ORDERED.**

---

**25.** Again, to the extent that the dismissals concern the FDA issue, the dismissals are without prejudice to a future filing.

**26.** Again, to the extent these dismissals concern the FDA issue, they are without prejudice to a later filing.